**STATE of Minnesota, Respondent,**

v.

**Lawrence Washington TRIPLETT, Appellant.**

**No. CX–88–119.**

Supreme Court of Minnesota.

Jan. 20, 1989.

---

C. Paul Jones, State Public Defender, Marie Wolf, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, State Atty. Gen., St. Paul, and James Backstrom, Dakota Co. Atty., Hastings, for respondent.

## OPINION

YETKA, Justice.

Defendant Lawrence Triplett was convicted following a jury trial in Dakota County District Court of two counts of first-degree murder in connection with the May 28, 1987 death of Charles Young. Defendant was sentenced to the mandatory term of life imprisonment. On appeal, defendant seeks reversal on the grounds that the evidence was insufficient to support his convictions for first-degree felony murder and first-degree premeditated murder. Specifically, defendant claims that he acted in self-defense and that the state failed to prove beyond a reasonable doubt that he killed Young while committing a burglary or that he killed Young intentionally and with premeditation. We affirm the conviction.

A full statement of the facts is necessary to resolve these questions. Prior to the incident on May 29, 1987, Patricia Bolden had been involved with both the victim, Charles Young, and the defendant, Lawrence Triplett. Bolden had known Charles Young all her life and the two had been involved in an 11–year relationship which ended in 1982 when Bolden moved to Minnesota. During this time, Young fathered two of her children. In 1985, Bolden began dating the defendant, who, at the time, was involved in what he termed a common law marriage with Linda Stellick. Defendant and Bolden lived together for a year, but at the time of the murder, he was not living with her.

In the spring of 1987, Young called Bolden from Mississippi and indicated that he wanted to visit his children who were living with her in Minnesota. Bolden knew that Young's visit would anger defendant so she called the police and falsely reported that Young had threatened her life. Young came to Minnesota anyway and stayed with Bolden during his visit.

Bolden described her relationship with the defendant as abusive. She suffered both physical and verbal abuse which required her, on several occasions, to obtain court restraining orders against the defendant. Nevertheless, in spite of this mistreatment, she continued to see the defendant and occasionally let him stay at her apartment although she denied that she ever gave the defendant keys to her home.

Defendant, on the other hand, described his relationship with Bolden as "hell" and admitted that, while he had been abusive at times, it was because of her personality and extensive drug use. He claims to have tried to break off the relationship, but was not able to do so because Bolden would threaten his family or threaten suicide. He claims that she would also invite him over, even after obtaining restraining orders, only to call the police and have him arrested.

### Events Prior to May 28

Patricia Bolden testified that, on Wednesday, May 20, 1987, defendant called her and asked if he could pick up his possessions at her townhouse in Eagan. When defendant arrived at Bolden's home, Young, who had been at Bolden's home for several days, would not let defendant see Bolden. After words were exchanged, defendant took his records and left without asking for the rest of his belongings.

According to Bolden, on Sunday, May 24, 1987, defendant came over to Bolden's apartment when only she and her son were home. Defendant told Bolden that if she put Young out of the house, he would not bother her anymore, but if she didn't put Young out, he would have to hurt Young and probably her too.

On May 26, Bolden's brother, Kendall Taylor, and his wife Constance came to her

townhouse to drive her to her aunt's home in north Minneapolis. While they were all inside the townhouse, defendant knocked at the door. Bolden told everyone not to let him in and defendant left. When they left to drive to Bolden's aunt's, defendant reappeared. When Bolden refused to talk with defendant, he struck her in the face. Defendant and Young exchanged words and Bolden, her brother, his wife and Young drove away. Defendant followed their car from Eagan to south Minneapolis, but drove away when Kendall Taylor turned into a police station.

Constance Taylor corroborated Bolden's testimony as to the events of that day. She stated that she saw defendant attempt to strike Bolden and that he followed their car from Eagan to south Minneapolis.

Shortly after this encounter, the evidence shows that defendant called a friend, Melvin Tousant, and asked if he could borrow a gun. When Tousant asked him why he wanted a gun, defendant told him that he had had a conflict with Charles Young and Young had pulled a gun on him. Defendant arranged to meet Tousant at the home of Michael Terry, defendant's nephew. When Tousant arrived at Terry's, he attempted to calm defendant, but defendant insisted on borrowing a gun. Defendant told Tousant that nobody was going to pull a gun on him without using it and that he was going to kill Young. Michael Terry testified that defendant told him that some guy had pulled a gun on him and that defendant was going to hurt him before he hurt defendant.

Defendant's version of the events is again different. He denied that he hit Bolden or that he followed her brother's car. Defendant said that he went to Bolden's on May 26 because she had asked him to help get her car. When defendant arrived, Bolden's brother, his wife, and Young were outside. Defendant grabbed Bolden by the arm, but did not punch her. Defendant claims that, while he was attempting to speak with Bolden, Young went inside the townhouse to get cigarettes. When Young came back outside, defendant claimed that he could see the outline of a gun in Young's

pocket. As soon as he saw the gun in Young's pocket, defendant got in his car and left.

Defendant admitted that, after this incident, he had attempted to get a gun from Melvin Tousant. Defendant, however, denied telling Tousant that he was going to kill Young and maintained that he only wanted the gun to protect himself and his family from Young.

*Events of May 27 and May 28*

On May 28, 1987, at approximately 5:30 a.m., residents of the Cedar Bluff Townhouses on Valley Ridge Drive in Eagan, Minnesota, were awakened by sounds of screaming. Residents looked out their windows and saw a nude black woman (later identified as Patricia Bolden) screaming that someone was trying to kill her husband and that someone should call the police. Before the police arrived, defendant came out of Bolden's townhouse and walked towards her. Defendant told residents that there was no problem and that Bolden was just freaking out. Defendant attempted to pull Bolden away, but she grabbed onto a parked van. He then grabbed her around the waist and pulled her back into the townhouse. Moments after defendant dragged her back into the townhouse, Bolden appeared at an upstairs window with her daughter and began yelling for help. Bolden then disappeared from the window and, moments later, residents heard two or three loud thumps and more screaming.

Sergeant Gerald J. Meszaros, an Eagan police officer, arrived on the scene just as Bolden and her daughter were screaming out the bedroom window for help. As Sergeant Meszaros approached Bolden's townhouse, the door burst open and Patricia Bolden, bleeding profusely from the head, ran outside. Defendant followed Bolden, was identified, arrested and placed in the squad car.

Having been informed by Ms. Bolden that her "husband" was being killed inside, Meszaros and John Simpson, a neighbor, entered the townhome to search for the injured person. They found Charles Young at the top of the stairs lying in the doorway

of the master bedroom. Before lapsing into unconsciousness, Young told Meszaros, "Help me. I've been stabbed. I'm dying." Paramedics transferred Young to St. Paul–Ramsey Medical Center. During emergency surgery, doctors removed the lower portion of Young's right lung to stop the bleeding from a chest wound and removed a broken knife blade from his spine. After surgery, Young suffered a cardiac arrest, but was resuscitated; however, a short time later, he suffered a second cardiac arrest and died.

Dr. Michael McGee, the medical examiner, testified that there were 17 separate wounds on Young's body caused by an object with a pointed or sharp-edged surface. Young's wounds, according to Dr. McGee, were consistent with his being stabbed while asleep or struggling on a waterbed. Dr. McGee determined that the cause of death was exsanguination—bleeding to death as a result of stab wounds to the chest region.

After paramedics took Young away, police searched Bolden's apartment. In the living room, they found two dumbbells, one of which was covered with blood, and a bent fireplace poker. In the master bedroom, police found a bloody and torn waterbed sheet. A search of the entire apartment did not reveal any guns or weapons except for a utility knife on a kitchen counter.

Eagan Police Officer Thomas Schoenecker arrived at the scene shortly after Sergeant Meszaros. While Meszaros was inside the townhome, Schoenecker stayed outside where he observed defendant, who was sitting in the squad car, throw an object out of the squad car. Schoenecker picked up the object and observed that it was the handle of a cutlery knife with the blade broken off. Tests performed on the handle established that it was the handle for the blade that the doctors extracted from Young's back.

At trial, the state and defendant offered conflicting testimony as to what occurred on May 27 and May 28. The state's key witness, Patricia Bolden, testified that, at approximately 5:00 or 5:30 a.m., while asleep in bed with Charles Young, she was awakened by the opening of her front door. When she looked up moments later, she saw defendant creeping up the stairs to her bedroom, screamed and tried to get out of bed. Just as Bolden began screaming, she saw defendant fall to his knees beside the bed, hold Young down, and begin stabbing him repeatedly. Bolden ran out of the room, screamed to warn her children, grabbed a towel to cover herself, and ran outside towards the other townhouses to get help.

Defendant followed her out of the townhouse and asked her to return to the apartment. Bolden refused and tried to hold onto a car, but defendant pulled her away from the car and dragged her across the street back into the apartment. As soon as Bolden was back in her apartment, she broke away from defendant and ran upstairs to her daughter Jackalyn's room. Jackalyn was already awake and, seeing her mother, screamed, "He ain't going to let me out. Mama, he ain't going to let me out." Bolden and her daughter began screaming out the window for help. Defendant then came into Jackalyn's bedroom, grabbed Bolden by the hair, dragged her downstairs to the living room and began beating her with a fireplace poker. Bolden claims that, when she asked defendant why he was doing this, he replied, "I told you, I told you." When the poker which defendant was using to beat Bolden broke, he picked up a dumbbell and struck her on the head three times. Moments later, the doorbell rang and Bolden was able to break away from defendant. She opened the door and ran outside where she met the police. As a result of the beating defendant gave her, Bolden suffered a broken hand, bruises to her arms and legs, and several wounds on her head that required stitches.

Jackalyn Bolden, Ms. Bolden's 14-year-old daughter, testified that, on May 28 at about 5:30 a.m., she was sleeping at her home when she was awakened by her mother's screams of "get out of here" and "run for your life." Jackalyn stayed in her bedroom and, from her window, saw her

mother run outside towards neighboring townhouses. She saw defendant first run, then walk, after her mother. Jackalyn heard defendant tell the neighbors that her mother had "flipped out" and dragged her back inside. Bolden ran up to Jackalyn's room and told her to jump out the window. Defendant then came into the room, grabbed Bolden and dragged her downstairs. As defendant was dragging Bolden out the door, he told Jackalyn, "I'm going to kill you too." A few moments later, Jackalyn heard several "pounds" and "hits" from downstairs. Jackalyn then looked out her bedroom door and saw Charles Young lying on the stairs. When Young saw her, he told her to "go back into [her] room and close the door."

At trial, defendant offered a different version of the events of May 27 and 28. Defendant testified that, during the evening of May 27, 1987, Bolden telephoned him and, at some point in their conversation, she mentioned that Young had a gun. When defendant heard Bolden say this, he told Bolden that their relationship was not going to work out and asked if he could come over to get the rest of his possessions. Defendant said he also reminded Bolden that he wanted to get her waterbed to hold as collateral until she had his car repaired. He claims that Bolden agreed to this and told him to come over to pick up his belongings and the waterbed after he got off work at 5:00 a.m. Defendant said that, even though Bolden had told him Young would be gone, it crossed his mind that she might be trying to trap him.

After this conversation with Bolden, defendant testified that he became so upset that he decided not to go to work. At about 7:30 p.m., he smoked a marijuana joint to calm down and then went to a bar in Minneapolis to get money a friend owed him in order to buy a gun. Defendant said that he wanted the gun only to protect his family. Defendant received the money from his friend, but was unable to purchase a gun and returned home at approximately 9:30 p.m. At about 11:00 p.m., Bolden called defendant to ask him if he was still coming over. When defendant told Bolden that he had not gone to work, she

asked him to come over immediately, but defendant declined, saying that he would be over at 5:00 a.m. as expected. At 2:00 a.m., May 28, defendant received a call from a man who did not identify himself, but who defendant was sure was Charles Young. The caller told defendant that defendant's daughter was pretty and it would be too bad if something happened to her. At approximately 5:00 a.m., defendant left home and drove to Bolden's apartment.

After arriving at Bolden's, defendant claims that he entered through the front door using a key Bolden had given him to allow him to fix her van and keep an eye on her kids at times when she was out. When defendant entered the townhouse, he saw Bolden sleeping in the living room in front of the television, naked except for a towel. Bolden woke up and defendant began gathering his personal belongings. Defendant said that he first took his records off a coffee table and brought them out to his car. He then loaded a car jack and a tennis racket into his trunk and went back into Bolden's apartment and asked Bolden to get his dishes. At this time, defendant noticed that Bolden was acting "funny." She told him that his dishes were in the closet upstairs and that he should get them himself.

On his way upstairs, defendant saw a knife on the kitchen table. Defendant told Bolden that he wanted this knife as a fishing knife and put it in his back pocket. As defendant was walking up the stairs, Bolden yelled, "Charles, Larry's here to kill us." Charles Young then opened a bedroom door and began choking defendant. Defendant braced himself against the bedroom door to try to push Young away, but Young held onto him and both men fell on the waterbed in the master bedroom. Young continued to choke defendant while defendant struggled to get away.

During the struggle, defendant saw the glint of a shiny object, which he later identified as a "razor cutter," and felt his neck burn. Defendant then stabbed Young with the knife he had placed in his back pocket. He said that he only stabbed Young a couple of times at this point and that he did

so only to stop Young from choking him. Defendant claims that he tried to get off the waterbed, but Young pulled him down and said, "I'm going to kill you, you mother-fucking ass." Defendant then stabbed Young in the back again, breaking the blade of the knife.

After this blow, defendant was able to get away from Young, and he ran downstairs where he heard Bolden screaming outside. Defendant, though very frightened because of all the people outside, calmly walked over to Bolden and brought her back inside. Defendant admitted that he pulled Bolden from a car, but said that, once he did so, Bolden came back to the apartment voluntarily. Defendant also admitted that when they were back inside the apartment, he hit Bolden once with the fireplace poker and twice with the dumbbell, but maintained that he did so only to prevent her from hitting him. Defendant denied that he dragged Bolden from her daughter's room and said that Bolden walked down with him after he told her that he wanted to talk with her.

Once police arrived, defendant was arrested and placed in a squad car. Defendant admitted that, while sitting in the squad car, he removed the knife handle from his back pocket and slid it out the door of the squad car because he was worried that if the police found the knife on him, they would overreact.

Defendant denied that he intended or planned to kill Charles Young and maintained that he stabbed Young only to prevent Young from killing him. Defendant also denied that he intended to kill Patricia Bolden and said that he hit her only to prevent her from hurting him. Defendant believed that Bolden had set him up because she once threatened that she would see him in jail or dead if he went back to Linda and his children.

In support of his case, defendant offered the testimony of John Carroll, a consulting forensic engineer. Mr. Carroll, whose background is in structural engineering, had, on three prior occasions, examined waterbeds for causes of failure. It was Carroll's opinion that the damage to the waterbed was not consistent with Bolden's testimony that Young was stabbed while defendant was kneeling by the bed. Instead, Mr. Carroll felt that the damage to the waterbed was consistent with the damage that would be done by two large men falling and struggling on it.

Under cross-examination, Carroll revealed that he had formed his opinion from photos of the waterbed and had not actually examined the waterbed itself. Carroll admitted that he could not determine if the waterbed had been correctly installed nor did he know how the headboard had been fastened to the frame.

Defendant also offered the testimony of Linda Stellick, who said that, on the evening of May 27, defendant was at her home and was acting like a caged animal. The phone rang many times that evening and on one occasion, Stellick listened in and heard a man, whom she did not know, say, "You got an awfully pretty little girl and it would be a shame to see her hurt." After the call, Stellick said that defendant told her that Bolden had been bothering him and that somebody had come after him. Stellick then went to bed. When she awoke at 6:00 a.m., defendant was gone.

Prior to his trial testimony, defendant gave several different statements to the police. Defendant gave his first statement at the scene of the crime. After being read his rights and agreeing to speak, defendant told the police that he had come to Bolden's apartment to pick up his waterbed. He did not mention that he was going to hold it until car repairs were done nor did he mention that the bed was not actually his. Defendant said that, as soon as he entered the apartment, Young confronted him at the front door and attempted to choke him. Young then ran upstairs to the master bedroom and defendant followed, stopping to grab a knife from the kitchen table. Young entered the bedroom and ran to the far side of the bed. Defendant, believing that Young was reaching for a gun, stabbed him.

Defendant gave police a second statement on May 29. On that day, police had come to the Dakota County jail to inform

defendant that Young had died. Police read defendant his rights again and he agreed to talk.[1]

In the May 29 statement, defendant told police that Bolden gave him keys to her apartment 2 weeks before May 28 because "she wanted to be for real this time." Defendant said that he drove to Bolden's apartment early in the morning on May 28 and entered it using these keys. He gathered his records, placed them on a coffee table and went upstairs to look for the rest of his personal possessions. When defendant reached the top of the stairs, Bolden yelled, "Charles, Larry is here and he's going to kill you." Young appeared and grabbed defendant by the neck, leaving red marks on his neck. Defendant said that he then pushed Young onto the bed and stabbed him. He did not mention in this statement that Young had a gun or any other weapon.

On May 30, defendant asked to speak with a police officer about the incident at Bolden's apartment even though he had not yet spoken with an attorney. After being read his rights again and reiterating that he had initiated this statement, defendant told police that Bolden gave him the keys to her apartment 3 to 4 weeks before May 28 because he still had some of his belongings at her place and because she still wanted to be friends. On May 27, Bolden called him and asked him to come over to talk. Defendant said that he agreed, but only because he wanted to get his things. At approximately 5:00 a.m. on May 28, defendant drove to Bolden's apartment, entered and saw Bolden lying on the floor, nude except for a towel. In this statement, defendant said that he did not encounter Young until he went upstairs to get his dishes. He also said that he grabbed the knife from a kitchen table because Bolden was acting funny and had told him the day before that Young had a gun. In this statement, defendant stated that the only thing Young said to him was, "You cut me." Additionally, defendant said nothing about going to Bolden's to pick up a waterbed nor did he mention that Young had a knife or any other object in his hand during the scuffle.

On appeal, defendant contends that the evidence presented at trial was insufficient as a matter of law to sustain his conviction for two counts of first-degree murder because the state failed to prove beyond a reasonable doubt that: a) defendant did not act in self-defense, b) defendant caused the death of Charles Young while committing a burglary, and c) defendant killed Charles Young intentionally and with premeditation.

This court's scope of review on sufficiency-of-the-evidence claims is limited to a painstaking review of the record to determine whether, under the facts in the record and any legitimate inferences that can be drawn from them, a jury could reasonably conclude that defendant was guilty of the offense charged. *State v. Ulvinen*, 313 N.W.2d 425, 428 (Minn.1981); *State v. Martin*, 293 N.W.2d 54, 55 (Minn.1980). All evidence must be viewed in the light most favorable to the prosecution and this court must assume that the jury believed the evidence supporting the conviction and disbelieved any contrary evidence. *Ulvinen*, 313 N.W.2d at 428; *State v. Wahlberg*, 296 N.W.2d 408, 411 (Minn.1980). This is especially true when, as in the present case, resolution of the matter depends mainly on conflicting testimony. *State v. Pieschke*, 295 N.W.2d 580, 584 (Minn.1980).

■ The resolution of this case hinges on whether it was proper for the jury to believe the testimony of Patricia Bolden. Weighing the credibility of witnesses, including expert witnesses, is the exclusive function of the jury. *Pieschke*, 295 N.W.2d at 584. While it is true that evidence was introduced at trial that Bolden had used drugs, lied to police and forged checks, the

1. At a pretrial omnibus hearing, the district court ruled that the May 29 statement made at the Dakota County jail was taken in violation of defendant's constitutional rights because they were taken after he had requested to speak with counsel, but before counsel was provided. The district court, however, found that defendant's statement was voluntary and could thus be used for impeachment purposes at trial. October 5, 1987 Findings of Fact and Order, Order ¶ 4.

jury presumably took these incidents into account and was not precluded from believing her testimony because of her past misconduct. *See State v. Poganski*, 257 N.W. 2d 578, 581 (Minn.1977) (jury could choose to believe the testimony of witnesses even though the witnesses had been involved in numerous fraudulent schemes).

 Independent evidence exists which supports the jury's belief of Bolden's testimony and disbelief of defendant. There was independent testimony that, 2 days prior to the murder, defendant attempted to hit Bolden and then followed her and her relatives as they drove to south Minneapolis. There was also independent testimony that, after this encounter, defendant threatened to kill Charles Young and attempted to buy a gun. In addition, defendant's own inconsistent statements to police contradicted his trial testimony.

Bolden's testimony and the independent evidence prove that defendant did not act in self-defense and did not have Bolden's permission to enter her home. In addition, both support the jury's conclusion that defendant intentionally and with premeditation killed Charles Young.

The evidence shows that, 2 days before the offense, defendant threatened to kill Charles Young and attempted to obtain a gun. Hours before the offense, defendant was agitated and upset at the home of Linda Stellick. At 5:00 a.m. on May 28, defendant quietly entered Bolden's home and immediately crept upstairs to where Young and Bolden were sleeping. Defendant then entered the bedroom, knelt beside Young and stabbed him approximately 17 times. One blow was delivered so hard and deep that a portion of Young's lung had to be removed to stop the bleeding and the last blow was so hard that the blade of the knife broke off in Young's spine. Clearly, defendant's threats against Young and his surreptitious entry into Bolden's home, combined with the brutal manner in which Young was killed, readily support the jury's conclusion that defendant intentionally and with premeditation killed Charles Young. *See State v. Martin*, 261 N.W.2d 341 (Minn.1977) (while the brutality

of the killing does not alone support a finding of premeditation, it can certainly be considered by the jury as supporting an 'inference that defendant premeditated to act as he did).

Because we conclude that the state proved beyond a reasonable doubt all the elements of both first-degree felony murder and first-degree premeditated murder, the conviction is thus affirmed.