*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A13-0714**

State of Minnesota,
Respondent,

vs.

Christopher Steven Pettinelli,
Appellant.

**Filed September 8, 2014**
**Affirmed**
**Cleary, Chief Judge**

St. Louis County District Court
File No. 69VI-CR-11-372

Lori Swanson, Attorney General, John B. Galus, Assistant Attorney General, St. Paul, Minnesota; and

Mark Rubin, St. Louis County Attorney, Duluth, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, St. Paul, Kirk M. Anderson, Special Assistant Public Defender, Anderson Law Firm, PLLC, Minneapolis, Minnesota (for appellant)

        Considered and decided by Cleary, Chief Judge; Halbrooks, Judge; and Bjorkman, Judge.

UNPUBLISHED OPINION

**CLEARY**, Chief Judge

Appellant Christopher Steven Pettinelli challenges his conviction and sentence for first-degree operation of a snowmobile while under the influence of alcohol. He argues that the district court made erroneous evidentiary rulings, that there was insufficient evidence presented to support the jury's guilty verdicts and finding of an aggravated-sentencing factor, and that the district court abused its discretion by departing from the presumptive sentence under the Minnesota Sentencing Guidelines. Appellant also challenges the district court's denial of his petition for postconviction relief, arguing that the result of his warrantless blood test should have been suppressed under *Missouri v. McNeely*, 133 S. Ct. 1552 (2013), and *State v. Brooks*, 838 N.W.2d 563 (Minn. 2013), *cert. denied*, 134 S. Ct. 1799 (2014). We affirm.

## FACTS

On March 26, 2011, Dan Starr, an officer with the Minnesota Department of Natural Resources (DNR), and several other DNR and law enforcement officers were patrolling a "water skipping" event in St. Louis County where snowmobilers rode over open water. Approximately 400–500 people had gathered to observe or participate in the event, which had a history of involving property damage, littering, fighting, careless driving, alcohol consumption by minors, and driving while impaired (DWI). At one point, Officer Starr saw three snowmobiles pass under a bridge on open water. The second snowmobile was driven by a person wearing a red and white jacket and carried a

passenger who was small in stature and had "large . . . fluffy hair." Office Starr identified the passenger as a female. The third snowmobile was driven by a large person wearing a brown jacket, black helmet, and black backpack. Officer Starr observed the three snowmobiles stopped on a frozen lake near two other snowmobiles, one of which appeared to be stalled. Officer Starr radioed other DNR officers in the area for assistance at approximately 7:15 p.m. While water skipping is not illegal, Officer Starr believed that water skipping with a passenger on a snowmobile constituted careless operation of a snowmobile, which is unlawful, and he requested that an officer detain the driver wearing the red and white jacket.

DNR Officer Brent Speldrich arrived on the scene, approached the group of snowmobilers on his own snowmobile, and began speaking with the driver wearing the red and white jacket, who was identified as C.N. Officer Starr and five other DNR officers approached the group by foot, and all of the officers at the scene were wearing uniforms. Officer Starr recognized appellant from previous contacts. He exchanged a few words with appellant and noted that appellant was wearing a large brown jacket and a black helmet. Officer Starr was certain that appellant was the person that he had seen driving the third snowmobile because appellant "was the only person out there wearing a brown . . . jacket and black helmet." Officer Starr identified C.N.'s female passenger as C.C., who he also knew from previous contacts. Officer Starr then spoke with C.N., who was ultimately arrested for DWI. Meanwhile, Officer Speldrich observed the group of snowmobilers as they talked and tried to fix the stalled snowmobile, and he noted that

3

appellant had slurred speech and unsteady balance. Officer Speldrich asked Officer Starr whether appellant had been driving a snowmobile, and Officer Starr approached appellant and stated that he "just saw [appellant] operating the snowmobile under the bridge" and that appellant was lying if he was claiming otherwise. Officer Speldrich began to speak with appellant and observed slurred speech, unsteady balance, an odor of alcohol on appellant's breath, and bloodshot, watery, and dilated eyes. These observations led Officer Speldrich to believe that appellant was under the influence of alcohol. Officer Speldrich instructed appellant to step "off to the side away from the group of people" and asked whether appellant had been drinking. Appellant admitted that he had started drinking at about 2:30 p.m. and had consumed "ten beers." Officer Speldrich administered field sobriety tests, concluded that appellant had been operating a snowmobile while under the influence of alcohol, and arrested appellant for DWI.

Officer Speldrich read appellant the implied-consent advisory. Appellant was informed that Minnesota law required him to take a test to determine whether he was under the influence of alcohol, that refusal to take a test was a crime, and that he had the right to consult with an attorney before making the decision about testing. Appellant stated that he understood the advisory and wished to consult with an attorney, and a telephone and telephone books were made available to him. Appellant began to make telephone calls, and, approximately an hour later, he informed Officer Speldrich that he was finished making calls. He agreed to submit to a blood test and was taken to a

4

hospital where a blood sample was drawn at 10:20 p.m. The blood test revealed an alcohol concentration of .12.

Appellant was charged with first-degree operation of a snowmobile while under the influence of alcohol and first-degree driving with an alcohol concentration of more than .08. The state filed a notice that it was seeking an upward departure from the presumed guideline sentence based on the aggravating factor of appellant's unamenability to probation.

Appellant moved for suppression of the evidence against him and dismissal of the complaint, arguing that he was unlawfully seized without reasonable, articulable suspicion of criminal behavior when the DNR officers approached and spoke with him on the frozen lake. The district court denied appellant's motion, holding that the officers did not need reasonable, articulable suspicion to approach appellant when he was in a public place and that appellant was not seized until Officer Speldrich had probable cause to believe that appellant had operated a snowmobile while under the influence of alcohol.

A jury trial was held on November 27 and 28, 2012, and the jury found appellant guilty of the two charges. After an aggravated-sentencing hearing, the jury also found appellant unamenable to probation. At sentencing, the state requested that appellant receive the presumptive guideline sentence of 42 months, but asked that he be committed to prison even though the sentencing guidelines presumed a stayed prison sentence. Based on the jury's finding that appellant was unamenable to probation, the district court imposed a 42-month commitment for the offense of first-degree operation of a

snowmobile while under the influence of alcohol, and the charge of first-degree driving with an alcohol concentration of more than .08 was dismissed.

Appellant filed a notice of appeal on April 23, 2013. On November 26, 2013, he filed a postconviction petition in district court requesting an evidentiary hearing to determine whether the result of his blood test should be suppressed. He argued that he did not voluntarily consent to the warrantless blood draw and that the blood draw was therefore unconstitutional in light of *Missouri v. McNeely*, 133 S. Ct. 1552, and *State v. Brooks*, 838 N.W.2d 563, which were issued on April 17 and October 23, 2013, respectively. This court stayed the direct appeal and remanded the case to the district court for postconviction proceedings. The district court denied appellant's requests for an evidentiary hearing and postconviction relief, holding that appellant waived a challenge to the warrantless blood draw by failing to raise the issue previously, that "nothing contained within the opinions of *McNeely* or *Brooks* suggest[s] that the United States Supreme Court or the Minnesota Supreme Court intended their rulings to have retroactive application," and that "the petition and the files and records of the proceedings conclusively show that [appellant] is entitled to no relief." This court then reinstated the direct appeal and permitted appellant to also challenge the postconviction decision.

## DECISION

### I. The district court erred by declining to apply the holdings of *McNeely* and *Brooks* to appellant's warrantless blood draw.

The district court held that appellant waived a challenge to the warrantless blood draw and that *McNeely* and *Brooks* do not apply retroactively to this case. Appellant

6

challenges these holdings. "When a defendant initially files a direct appeal and then moves for a stay to pursue postconviction relief, we review the postconviction court's decisions using the same standard that we apply on direct appeal." *State v. Beecroft*, 813 N.W.2d 814, 836 (Minn. 2012).

### A.     Waiver of appellant's postconviction argument

This court will not reverse a district court's refusal to reopen an omnibus hearing absent an abuse of discretion. *See State v. Papadakis*, 643 N.W.2d 349, 356–57 (Minn. App. 2002). "A [district] court abuses its discretion when its decision is based on an erroneous view of the law or is against logic and the facts in the record." *Riley v. State*, 792 N.W.2d 831, 833 (Minn. 2011).

> Defenses, objections, issues, or requests that can be determined without trial on the merits must be made before trial by a motion to dismiss or to grant appropriate relief. The motion must include all defenses, objections, issues, and requests *then available*. Failure to include any of them in the motion constitutes waiver . . . .

Minn. R. Crim. P. 10.01, subd. 2 (emphasis added) (stating further that "[t]he court can grant relief from the waiver for good cause"). Generally motions relating to evidentiary issues are heard at pretrial omnibus hearings, and "[a] failure to raise *known issues* at the [o]mnibus [h]earing waives that issue." Minn. R. Crim. P. 11.02; Minn. R. Crim. P. 11 cmt. (emphasis added). Appellant contends that he did not know of his postconviction argument before trial and that the argument was not even available to him before trial because the opinions in *McNeely* and *Brooks* were issued after his trial and sentencing.

7

In *McNeely*, the Supreme Court held that the natural dissipation of alcohol in the bloodstream does not present a per se exigent circumstance that justifies an exception to the requirement of a search warrant under the Fourth Amendment to the United States Constitution. 133 S. Ct. at 1556, 1563. Instead, the Court held that whether a warrantless blood test of a DWI suspect is reasonable must be determined based on the totality of the circumstances. *Id.* at 1563. *McNeely* abrogated previously existing Minnesota caselaw that held that the natural dissipation of alcohol in blood did create a single-factor exigent circumstance justifying a warrantless chemical test to determine alcohol concentration. *See, e.g.*, *State v. Netland*, 762 N.W.2d 202, 212–14 (Minn. 2009), *abrogated in part by McNeely*, 133 S. Ct. 1552, *as recognized in Brooks,* 838 N.W.2d at 567; *State v. Shriner*, 751 N.W.2d 538, 545 (Minn. 2008), *abrogated by McNeely*, 133 S. Ct. 1552. Before *McNeely*, appellant did not have the legal ground to challenge his warrantless blood draw that he advanced in his postconviction petition. Proof of voluntary consent for a chemical test was previously unnecessary when the single factor of the natural dissipation of alcohol in blood excused the need for a search warrant. Because appellant could not have advanced his postconviction argument before trial, the district court's decision that he waived the argument is an abuse of discretion.

**B.  Application of *McNeely* and *Brooks***

Issues involving the application of caselaw are reviewed de novo. *Collins v. Minn. Sch. of Bus., Inc.*, 655 N.W.2d 320, 329 (Minn. 2003). A newly declared constitutional rule applies to all criminal cases pending on direct review or not yet final. *Griffith v.*

*Kentucky*, 479 U.S. 314, 322–23, 328, 107 S. Ct. 708, 713, 716 (1987) (stating that "the integrity of judicial review" requires application of the new rule to all similar cases pending on direct review); *Campos v. State*, 816 N.W.2d 480, 488 (Minn. 2012). A case or conviction becomes "final" when "a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied." *Griffith*, 479 U.S. at 321 n.6, 107 S. Ct. at 712 n.6. The opinions in *McNeely* and *Brooks* were issued on April 17 and October 23, 2013, before appellant's ability to appeal was exhausted and his conviction became final. The district court therefore erred by holding that *McNeely* and *Brooks* do not apply to appellant's case.

## II. Appellant voluntarily consented to the blood draw, and thus the warrantless blood draw was a reasonable search.

Although the district court held that appellant waived his postconviction argument, the court also stated that he "was offered the blood test and he consented." Appellant argues that the result of his blood test should have been suppressed because the warrantless blood draw was an unreasonable and unconstitutional search. He contends that he did not voluntarily consent to the blood draw. When the facts are not in dispute, a challenge to the validity of a search is reviewed de novo. *Haase v. Comm'r of Pub. Safety*, 679 N.W.2d 743, 745 (Minn. App. 2004).

The United States and Minnesota Constitutions guarantee the right to be secure against unreasonable searches and seizures. U.S. Const. amend. IV; Minn. Const. art. I, § 10. The taking of a blood, breath, or urine sample is a physical intrusion that

9

constitutes a search. *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 616–17, 109 S. Ct. 1402, 1412–13 (1989). A search is generally unreasonable unless conducted pursuant to a warrant issued upon probable cause. *Id.* at 619, 109 S. Ct. at 1414. However, there are established exceptions to the warrant requirement, one of them being consent to the search. *State v. Hummel*, 483 N.W.2d 68, 72 (Minn. 1992) (citing *Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507 (1967)).

Valid consent to search must be freely and voluntarily given, and whether consent is voluntary is determined based on the totality of the circumstances. *State v. Othoudt*, 482 N.W.2d 218, 222 (Minn. 1992) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S. Ct. 2041 (1973)). Voluntary consent is that given without coercion, such that a reasonable person would feel free to decline law enforcement's requests or otherwise terminate the encounter. *State v. Dezso*, 512 N.W.2d 877, 880 (Minn. 1994) (citing *Florida v. Bostick*, 501 U.S. 429, 111 S. Ct. 2382 (1991)); *see also Schneckloth*, 412 U.S. at 225–26, 93 S. Ct. at 2047 (stating that a suspect is coerced into giving consent when "his will has been overborne and his capacity for self-determination critically impaired"). The state has the burden of showing by a preponderance of the evidence that a defendant voluntarily consented to a search. *State v. Harris*, 590 N.W.2d 90, 102 (Minn. 1999).

As previously mentioned, *Brooks* held that a driver may voluntarily consent to chemical testing to determine alcohol concentration even if informed that refusal to submit to testing is a crime in Minnesota. 838 N.W.2d at 570. In so holding, the supreme court rejected the argument that consent given under such circumstances is not

given voluntarily due to the inherently coercive nature of the request. This court is obligated to follow supreme court precedent. *State v. M.L.A.*, 785 N.W.2d 763, 767 (Minn. App. 2010), *review denied* (Minn. Sept. 2, 2010).

In *Brooks*, the defendant was arrested for DWI on three separate occasions and, on each occasion, was read the implied-consent advisory, spoke with an attorney by telephone, and agreed to submit to testing. 838 N.W.2d at 565–66. In response to the defendant's argument that he was coerced into agreeing to testing because he was told that test refusal is a crime, the supreme court held that "a driver's decision to agree to take a test is not coerced simply because Minnesota has attached the penalty of making it a crime to refuse the test." *Id.* at 570–71 (explaining that a decision to submit to testing is not coerced just because the choice is a difficult one and involves a consequence). Instead, the supreme court held that whether consent is voluntary or coerced must be determined by examining "the totality of the circumstances, including the nature of the encounter, the kind of person the defendant is, and what was said and how it was said." *Id.* at 569 (quotation omitted). Moreover, the language of the implied-consent advisory makes clear that a person has a choice whether to submit to testing, and "the fact that someone submits to [a] search after being told that he or she can say no to the search supports a finding of voluntariness." *Id.* at 572. The *Brooks* court concluded that nothing in the record suggested that the defendant "was coerced in the sense that his will had been overborne and his capacity for self-determination critically impaired." *Id.* at 571 (quotation marks omitted).

11

Similarly, nothing in the record before this court suggests that appellant's will was overborne and that his capacity for self-determination was critically impaired. Appellant was read the implied-consent advisory, and he stated that he understood the advisory and wished to consult with an attorney. A telephone and telephone books were made available to him, and he had approximately an hour to make telephone calls, after which he informed Officer Speldrich that he was finished making calls. He agreed to submit to a blood test and was transported to a hospital to have his blood drawn. Although appellant was told that test refusal is a crime, the language of the implied-consent advisory also informed him that whether to submit to testing was his choice. *See id.* at 572.

Appellant argues that his case is distinguishable from the facts in *Brooks* because he did not speak with an attorney. The *Brooks* court stated that the fact that the defendant "consulted with counsel before agreeing to take each test reinforces the conclusion that his consent was not illegally coerced." *Id.* at 571. The record reflects that appellant was given the opportunity and ample time to call an attorney and that he chose not to continue to attempt to reach an attorney. The fact that he did not actually speak with an attorney is not dispositive of the issue of consent. Based on the totality of the circumstances, appellant voluntarily consented to the warrantless blood draw, and the blood draw was a reasonable search.

12

**III. The district court did not err by denying appellant's pretrial motion to suppress evidence.**

The district court denied appellant's motion for suppression of the evidence and dismissal of the complaint, holding that the DNR officers did not need reasonable, articulable suspicion of criminal behavior to approach appellant when he was in a public place and that appellant was not seized until Officer Speldrich had probable cause to believe that appellant operated a snowmobile while under the influence of alcohol. Appellant challenges these holdings. "[W]hen the facts are not in dispute, a reviewing court must determine whether a police officer's actions constitute a seizure and if the officer articulated an adequate basis for the seizure." *Harris*, 590 N.W.2d at 98. When reviewing the legality of a seizure, a district court's findings will not be reversed unless they are clearly erroneous or contrary to law, but a determination as to the existence of reasonable, articulable suspicion or probable cause is reviewed de novo. *State v. Munson*, 594 N.W.2d 128, 135 (Minn. 1999).

**A. Seizure based on reasonable, articulable suspicion**

As stated above, the United States and Minnesota Constitutions guarantee the right to be secure against unreasonable searches and seizures. U.S. Const. amend. IV; Minn. Const. art. I, § 10. Under the Minnesota Constitution, a "seizure" of a person by a police officer "occurs only 'when the officer, by means of physical force or show of authority, has in some way restrained the liberty of [the] citizen.'" *In re Welfare of E.D.J.*, 502 N.W.2d 779, 781 (Minn. 1993) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 1879 n.16 (1968)). "[A] person has been seized if in view of all of the

circumstances surrounding the incident, a reasonable person would have believed that he or she was neither free to disregard the police questions nor free to terminate the encounter." *State v. Cripps*, 533 N.W.2d 388, 391 (Minn. 1995); *see also State v. Hanson*, 504 N.W.2d 219, 220 (Minn. 1993) (stating that the question to be asked is whether, "looking at all of the facts, the conduct of the police would communicate to a reasonable person in the defendant's physical circumstances an attempt by the police to capture or seize or otherwise to significantly intrude on the person's freedom of movement").[1]

> "Examples of circumstances that might indicate a seizure . . . would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."

*E.D.J.*, 502 N.W.2d at 781 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 1877 (1980)).

Not all "personal intercourse" between citizens and the police constitutes a seizure. *Id.* (quoting *Terry*, 392 U.S. at 19 n.16, 88 S. Ct. at 1879 n.16). "We have generally held that a reasonable person would not believe that he or she has been seized

---

[1] The Minnesota Supreme Court has interpreted this state's constitution to afford greater protection to individuals when it comes to seizures than is afforded by the United States Constitution as interpreted by the United States Supreme Court. Under the federal constitution, no seizure occurs unless a reasonable person would not feel free to leave *and* the individual *actually submits* to a show of authority or is subject to physical force by police. *California v. Hodari*, 499 U.S. 621, 626–28, 111 S. Ct. 1547, 1550–51 (1991). The Minnesota Supreme Court has explicitly rejected the *Hodari* approach in interpreting the Minnesota Constitution. *See E.D.J.*, 502 N.W.2d at 781–83.

when an officer merely approaches that person in a public place and begins to ask questions." *Cripps*, 533 N.W.2d at 391; *see also Florida v. Royer*, 460 U.S. 491, 497, 103 S. Ct. 1319, 1324 (1983) (stating that an officer does not convert an encounter into a seizure merely by approaching an individual on the street or in some other public place and asking him or her questions).

Officer Starr called DNR officers to the scene to detain C.N. due to concern that C.N. operated his snowmobile carelessly by water skipping with a passenger. Officer Starr spoke to appellant briefly before turning his attention to C.N. Appellant and the other snowmobilers then talked and tried to fix the stalled snowmobile while Officer Speldrich observed the group. At some point thereafter, Officer Starr approached appellant stating that he had seen appellant operating a snowmobile and that appellant was lying if he was claiming that he had not been driving. Officer Speldrich began to speak with appellant and observed indicia of intoxication. These interactions with appellant occurred in a public place on a frozen lake. Appellant was not seized up to this point, as there was no physical force or show of authority by the officers to cause a reasonable person in appellant's position to feel that his or her liberty or freedom of movement was restrained. The officers did not seize appellant by speaking with him in a public place.

Appellant argues that there was a show of authority when several uniformed DNR officers approached the group of snowmobilers. The "threatening presence of several officers" is one "circumstance[] that might indicate a seizure." *E.D.J.*, 502 N.W.2d at

781 (quotation omitted). But the record reflects that multiple snowmobilers were also present at the scene and that appellant interacted only with Officers Starr and Speldrich. There is no indication that the group of officers did anything to appear threatening. Appellant also argues that he would have been "pursued by one of the officers" if he had made "[a]ny attempt . . . to leave the scene." As this situation did not occur, this possibility does not impact our seizure analysis. *Cf. Crawford v. Comm'r of Pub. Safety*, 441 N.W.2d 837, 839 (Minn. App. 1989) (holding that an officer's testimony that "she would have stopped respondent if he had driven off" did not convert a situation into a seizure when the respondent did not drive off).

After Officer Speldrich observed indicia of intoxication, he asked appellant to step to the side away from the group and perform field sobriety testing. The initiation of field sobriety testing or preliminary breath testing is an intrusion that must be justified by reasonable, articulable suspicion of DWI. *See State v. Klamar*, 823 N.W.2d 687, 696 (Minn. App. 2012); *State v. Vievering*, 383 N.W.2d 729, 730 (Minn. App. 1986), *review denied* (Minn. May 16, 1986). Reasonable, articulable suspicion exists "when an officer observes unusual conduct that leads the officer to reasonably conclude in light of his or her experience that criminal activity may be afoot." *In re Welfare of G.M.*, 560 N.W.2d 687, 691 (Minn. 1997). The reasonable-suspicion standard is not high, but the suspicion must be based on particularized and objective facts rather than on a mere hunch. *State v. Timberlake*, 744 N.W.2d 390, 393 (Minn. 2008).

Before appellant was pulled away from the group, Officer Speldrich observed that appellant had slurred speech, unsteady balance, an odor of alcohol on his breath, and bloodshot, watery, and dilated eyes. *See State v. Crane*, 766 N.W.2d 68, 74 (Minn. App. 2009) ("Indicia of intoxication give an officer reasonable articulable suspicion that a driver is operating a vehicle while under the influence."), *review denied* (Minn. Aug. 26, 2009). Officer Speldrich also heard Officer Starr state that appellant had been driving a snowmobile. *See Klotz v. Comm'r of Pub. Safety*, 437 N.W.2d 663, 664 (Minn. App. 1989) (stating that "[a]n officer may rely on facts which another person told him to form the basis for reasonable suspicion"), *review denied* (Minn. May 24, 1989). While having appellant step away from the group and perform field sobriety testing constituted a seizure by law enforcement, that seizure was supported by reasonable, articulable suspicion that appellant had been driving a snowmobile while impaired.

### B. Probable cause to arrest

A warrantless arrest of an individual in a public place is permissible if supported by probable cause. *State v. Howard*, 373 N.W.2d 596, 598 (Minn. 1985) (citing *United States v. Watson*, 423 U.S. 411, 96 S. Ct. 820 (1976)). "[T]he probable cause standard asks whether the totality of the facts and circumstances known would lead a reasonable officer to entertain an honest and strong suspicion that the suspect has committed a crime." *State v. Koppi*, 798 N.W.2d 358, 363 (Minn. 2011) (quotation omitted). A determination as to the existence of probable cause is an objective inquiry that depends on the officer's observations, information, and police experience. *Id.* at 362–63.

Before Officer Speldrich arrested appellant, he observed appellant display the previously mentioned indicia of intoxication. He heard Officer Starr state that appellant had been driving a snowmobile and heard appellant admit that he started drinking at about 2:30 p.m. and had consumed "ten beers." Based on these observations, the results of the field sobriety tests, and his experience and training, Officer Speldrich decided to arrest appellant for operating a snowmobile while under the influence of alcohol. Under these circumstances, Officer Speldrich had probable cause to arrest appellant. *See, e.g.*, *State v. Kier*, 678 N.W.2d 672, 678 (Minn. App. 2004) (stating that "[a]n officer needs only one objective indication of intoxication to constitute probable cause to believe a person is under the influence"); *State v. Laducer*, 676 N.W.2d 693, 698 (Minn. App. 2004) ("An admission of drinking, coupled with other indicators of intoxication, is sufficient for probable cause to arrest.").

Because appellant was seized when law enforcement had reasonable, articulable suspicion of criminal activity and was arrested based on probable cause of commission of a crime, the district court did not err by denying appellant's pretrial suppression motion.

## IV. There was sufficient evidence presented at trial to permit the jury to find that appellant was driving a snowmobile at the time that he was impaired.

The jury found appellant guilty of the two DWI charges. Appellant argues that there was insufficient evidence from which the jury could conclude that he was driving a snowmobile at the time that he was impaired. Appellate review of a challenge to the sufficiency of the evidence involves "a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was

18

sufficient to permit the jurors to reach the verdict which they did." *State v. Webb*, 440 N.W.2d 426, 430 (Minn. 1989). The jury's verdict will not be disturbed "if the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that [the] defendant was proven guilty of the offense charged." *Bernhardt v. State*, 684 N.W.2d 465, 476–77 (Minn. 2004) (quotation omitted). The reviewing court must assume that the jury believed the state's witnesses and disbelieved any evidence to the contrary. *State v. Moore*, 438 N.W.2d 101, 108 (Minn. 1989). "This is especially true where resolution of the case depends on conflicting testimony, because weighing the credibility of witnesses is the exclusive function of the jury." *State v. Pieschke*, 295 N.W.2d 580, 584 (Minn. 1980).

Officer Starr testified at trial that he saw a large person wearing a brown jacket and a black helmet driving a snowmobile. He further testified that, when he approached the group of snowmobilers and spoke to appellant, appellant was wearing a large brown jacket and a black helmet. Officer Starr stated that he was certain that appellant was the person that he saw driving a snowmobile because appellant "was the only person out there wearing a brown . . . jacket and black helmet." Officer Starr identified the passenger on C.N.'s snowmobile as a female because the passenger was small in stature and had large, fluffy hair. C.N. testified at trial that C.C. was a passenger on his snowmobile and that appellant was driving a snowmobile. C.C. also testified at trial that

appellant was driving a snowmobile and that she was a passenger on C.N.'s snowmobile. We must assume that the jury believed these state witnesses.

Appellant points out that there was inconsistent evidence regarding whether appellant was driving a snowmobile or was a passenger. V.D., another snowmobiler present at the scene, testified at trial that C.C. was driving a snowmobile and that appellant was her passenger. We must view the evidence in a light most favorable to the conviction and assume that the jury disbelieved this witness. C.C. testified at an omnibus hearing before trial that she was driving appellant's snowmobile. Appellant suggests that C.C. may have changed her testimony for trial because she had broken off her relationship with appellant and was being offered immunity by the state. Appellant further suggests that C.N.'s testimony was mistaken because he was drinking alcohol on the day at issue. All of these matters were raised at trial during the cross-examination of C.C. and C.N. and relate to the weight and credibility to give to witness testimony, which was for the jury to resolve. There was sufficient evidence presented at trial from which the jury could conclude that appellant was driving a snowmobile, and the inconsistent witness testimony does not justify reversal of appellant's conviction. *See State v. Bakken*, 604 N.W.2d 106, 111 (Minn. App. 2000) ("Inconsistencies in testimony and conflicts in evidence . . . are not bases for reversal."), *review denied* (Minn. Feb. 24, 2000).

**V.      The district court did not abuse its discretion by admitting expert testimony regarding retrograde extrapolation.**

Appellant's alcohol concentration was .12 when his blood was drawn at 10:20 p.m. Amy Granlund, a forensic scientist with the Minnesota Bureau of Criminal

Apprehension, performed a calculation known as retrograde extrapolation to approximate that appellant's alcohol concentration was between .13 and .15 at 9:00 p.m., which was around two hours after appellant allegedly drove a snowmobile. Ms. Granlund testified about this method of calculation at trial, and appellant objected to admission of her approximation of appellant's alcohol concentration at 9:00 p.m. Appellant argued that the approximation lacked foundational reliability because several variables affect the dissipation of alcohol in blood, and Ms. Granlund did not have knowledge as to how all of those variables applied to appellant. The district court determined that Ms. Granlund could testify about her approximation and what variables she took into account when reaching the approximation and that the jury could then determine the weight to give to Ms. Granlund's testimony. Ms. Granlund testified that, when making her approximation, she had information about appellant's gender, height, weight, "how many beers [he] drank between a specific amount of time," and the fact that he did not consume more alcohol after driving. She testified that she did not have information about appellant's food consumption on the day at issue, what type of beer he consumed, whether he was an "experienced drinker," or whether he had any health conditions that might impact the dissipation of alcohol in his blood.

Appellant argues that the district court should not have permitted Ms. Granlund to testify about her approximation of appellant's alcohol concentration at 9:00 p.m. "[E]videntiary rulings rest within the sound discretion of the [district] court and will not be reversed absent a clear abuse of discretion." *State v. Griffin*, 834 N.W.2d 688, 693

21

(quotation omitted); *see also State v. Grecinger*, 569 N.W.2d 189, 194 (Minn. 1997) (stating that the decision whether to admit expert testimony is within the discretion of the district court). On appeal, it is an appellant's burden to establish that an evidentiary ruling was an abuse of discretion and that the appellant was prejudiced by the ruling. *Griffin*, 834 N.W.2d at 693.

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. The opinion must have foundational reliability. In addition, if the opinion or evidence involves novel scientific theory, the proponent must establish that the underlying scientific evidence is generally accepted in the relevant scientific community.

Minn. R. Evid. 702; *see also State v. Jensen*, 482 N.W.2d 238, 239–40 (Minn. App. 1992) (affirming the admission of expert testimony on retrograde extrapolation and stating that the *Frye-Mack* and *Dille* tests commonly used to examine the admissibility of scientific evidence do not apply to retrograde extrapolation, which is not emerging or novel and is a mathematical formula rather than a chemical or scientific test), *review denied* (Minn. May 15, 1992).

Here, Ms. Granlund testified that the approximation that she reached regarding appellant's alcohol concentration at 9:00 p.m. was "hypothetical[]" and an "assumption" based on typical elimination rates of alcohol from the human body and the information about appellant that she was given. She testified about the information that she lacked that may have affected her approximation. In *Jensen*, this court stated that "[v]ariables

22

affecting absorption and elimination rates would most likely go to the weight, rather than admissibility of retrograde extrapolation testimony." *Id.* at 240 n.2. "Weighing the credibility of witnesses, including expert witnesses, is the exclusive function of the jury." *State v. Triplett*, 435 N.W.2d 38, 44 (Minn. 1989). The district court did not abuse its discretion by admitting Ms. Granlund's testimony and permitting the jury to determine the weight to give to her approximation.

**VI.    There was sufficient evidence presented at the aggravated-sentencing hearing to permit the jury to find that appellant is unamenable to probation, and the district court did not abuse its discretion by departing from the presumptive guideline sentence.**

After an aggravated-sentencing hearing, the jury found that appellant was unamenable to probation. Based on this finding, the district court sentenced appellant to a 42-month commitment, which was a dispositional departure from the presumed guideline sentence of 42 months stayed. Appellant challenges the jury's finding and the district court's decision to depart from the presumptive guideline sentence.

**A.     The jury's finding that appellant was unamenable to probation**

> The sentence ranges provided in the Sentencing Guidelines Grids are presumed to be appropriate for the crimes to which they apply. Thus, the judge shall pronounce a sentence within the applicable range unless there exist identifiable, substantial, and compelling circumstances to support a sentence outside the range on the grids.

Minn. Sent. Guidelines II.D (2010). "'Substantial and compelling circumstances' are those circumstances that make the facts of a particular case different from a typical case." *Taylor v. State*, 670 N.W.2d 584, 587 (Minn. 2003). A defendant's particular

unamenability to probation may be used to justify a dispositional departure from a presumptive guideline sentence. *State v. Allen*, 706 N.W.2d 40, 46 (Minn. 2005). A jury's finding of a factor that may justify a sentencing departure is reviewed for a sufficiency of the evidence. *State v. Rodriguez*, 754 N.W.2d 672, 685 (Minn. 2008).

During the aggravated-sentencing hearing, Officer Speldrich testified that appellant's driving record showed three prior DWI arrests within ten years and that his driver's license had been canceled due to driving that was "inimical to public safety." Phillip Drobnick, a probation officer who supervised appellant following a prior DWI offense, testified that appellant had been found in violation of probation for failing to follow through with a chemical-dependency assessment, treatment, aftercare, a victim-impact panel, and reporting requirements. Mr. Drobnick stated that appellant was previously supervised by Lara Westberg, another probation officer, for another prior DWI. According to Mr. Drobnick, while under Ms. Westberg's supervision, appellant was also found in violation of probation for failing to remain law abiding and abstain from the use of alcohol. Mr. Drobnick testified that, in his opinion, appellant "is not amenable to probation" and "is a very high risk for public safety."

Appellant challenges the truthfulness of Mr. Drobnick's testimony. As previously stated, when examining the sufficiency of the evidence for a jury's finding, this court must assume that the jury believed the state's witnesses and disbelieved any evidence to the contrary, as determination of the weight and credibility to give to witness testimony is a task left to the jury. *See Moore*, 438 N.W.2d at 108. Appellant also argues that other

24

probation officers should have been put on the stand as well, but appellant had the opportunity to call witnesses on his own behalf at the aggravated-sentencing hearing. "Which witnesses to call and what evidence to present to the jury are matters of trial strategy, which are within the discretion of trial counsel." *State v. Bliss*, 457 N.W.2d 385, 392 (Minn. 1990). There was sufficient evidence presented at the aggravated-sentencing hearing from which the jury could find that appellant was unamenable to probation.

**B.     The district court's decision to depart**

A district court's decision to depart from a presumptive guideline sentence is reviewed for an abuse of discretion. *State v. Shattuck*, 704 N.W.2d 131, 140 (Minn. 2005). An appellate court is "extremely deferential" when reviewing a district court's decision whether to depart based on proper grounds that justify departure. *Dillon v. State*, 781 N.W.2d 588, 595–96 (Minn. App. 2010) (stating that "we have found no case in which this court or the supreme court has overturned a district court's decision *to* depart . . . when adequate departure grounds exist"), *review denied* (Minn. July 20, 2010). If a proper ground for departure exists, the appellate court "will uphold the sentence unless it has a strong feeling that the sentence is disproportionate to the offense." *State v. Kimmons*, 502 N.W.2d 391, 396 (Minn. App. 1993) (quotations omitted), *review denied* (Minn. Aug. 16, 1993).

Because the jury found that appellant was unamenable to probation, a proper ground to justify a dispositional departure existed. Appellant argues that the district court

abused its discretion by departing from the presumptive guideline sentence based on only this one aggravating factor. Appellant cites no authority providing that a sentencing departure must be based on more than one aggravating factor or on more than a defendant's unamenability to probation. *Cf. State v. Trog*, 323 N.W.2d 28, 31 (Minn. 1982) (stating that "a defendant's particular unamenability to probation will justify departure in the form of an execution of a presumptively stayed sentence"). Given the evidence presented regarding appellant's previous DWI offenses and his noncooperation while on probation, we cannot say that the sentence that appellant received is disproportionate to the offense. The district court did not abuse its discretion by imposing a sentence that was a dispositional departure from the presumptive guideline sentence.

**Affirmed.**