STATE of Minnesota, Respondent,

v.

Derrick Trevor GRIFFIN, Appellant.

No. A12–0823.

Supreme Court of Minnesota.

July 31, 2013.

Lori Swanson, Attorney General, Saint Paul, MN; and Michael O. Freeman, Hennepin County Attorney, Linda K. Jenny, Assistant Hennepin County Attorney, Minneapolis, MN, for respondent.

Bruce Rivers, Rivers & Associates P.A., Minneapolis, MN, for appellant.

## OPINION

GILDEA, Chief Justice.

A jury found appellant Derrick Griffin guilty of first-degree murder by drive-by shooting, in violation of Minn.Stat. §§ 609.185(a)(3), 609.11 (2012), and first-degree premeditated murder, in violation of Minn.Stat. §§ 609.185(a)(1), 609.11, 609.106, subd. 2(1) (2012), in connection with the death of Kristopher Miller. In this direct appeal, Griffin argues that the jury's verdict must be reversed because of the erroneous admission of out-of-court statements made by his wife, Kim Griffin,[1] and cell phone records obtained without a warrant. Because we conclude that the district court did not err in admitting the statement or the cell phone records, we affirm.[2]

On the night of May 10, 2011, Kristopher Miller was shot to death on the front porch of his home in Minneapolis. At the time of his death, Miller was in a romantic relationship with Griffin's wife, Kim. Prior to the murder, Griffin had discovered sexually explicit text messages on Kim's cell phone and thought Kim was seeing someone who worked at the Elks Club, which is located on Plymouth Avenue in North Minneapolis. On the evening of May 10, 2011, Kim was at the Elks Club with a group that included Miller; Miller's sister, L.M.; and L.M.'s boyfriend, L.B. When the group left the Elks Club at 11:15 p.m., they saw a white four-door Cadillac sedan parked across the street from the front door of the club. After seeing the vehicle, Kim said to the group "[l]ook at my husband over there, stalking me again." L.M. and L.B. also noticed the white four-door

---

1. For clarity, we refer to Derrick Griffin as "Griffin" and Kim Griffin as "Kim."

2. Griffin filed a Motion to Correct the Record to include a video recording of his wife's interview with police that he believed had been erroneously omitted from the district court record. Because the recording was included in the district court record, Griffin withdrew the motion at oral argument.

Cadillac but were unable to see if the vehicle was occupied and could not later identify the Cadillac specifically as Griffin's vehicle. After Kim's comment, Miller walked Kim to her car, gave her a hug, got into his truck, and drove away toward his home. L.M. and L.B. also left and none of the witnesses saw the Cadillac move.

Miller's home was "a couple blocks away" from the Elks Club. Three of Miller's neighbors heard gunshots at approximately 11:30 p.m., and two of the neighbors called 911. The same two neighbors saw a light colored large sedan similar to a Cadillac backing down Irving Avenue, the street on which Miller lived. Shortly thereafter, Miller was found dead on the front porch of his duplex. Miller died from multiple gunshot wounds to the back.

Upon arriving at the scene, police and officials from the Minneapolis crime lab searched the area for evidence but did not recover any shell casings or bullets. The lack of shell casings indicated to police that a revolver was most likely the type of gun used in the shooting. Police also spoke with L.M., who told the police she was with L.B., Miller, and Kim at the Elks Club that evening, and that Kim had made a statement that she had a stalker. Police confirmed Kim's identity and also discovered that Griffin was the registered owner of a 1996 white four-door Cadillac Sedan DeVille.[3]

When police contacted Kim, she gave them the number for a cell phone that was associated with Griffin and indicated that Sprint was the cell phone provider for that phone. Kim also told police that Griffin was aware of her relationship with Miller and that she thought she had seen Griffin at the Elks Club that evening. Additionally, Kim told police that after she left the Elks Club, she made and received calls on her cell phone to and from Griffin at 11:30, 11:46, 11:49, and 11:55 p.m. on May 10, related to why she saw Griffin outside the Elks Club. Kim told police that she did not need to tell Griffin she was on her way home from the Elks Club "because he would have already known that."

Based on their investigation, police suspected that Griffin was the perpetrator. But police had not recovered the murder weapon, and they did not know if anyone other than Miller was a target. Police therefore focused on trying to ascertain Griffin's location, and faxed an "exigent circumstances request" to Sprint/Nextel at 5:36 a.m. on May 11, 2011. For the phone Griffin was reported to be using, police requested the subscriber information, call detail records with cell-site information for the past week, and information showing the current location of the phone and its location over the past 14 days. To describe the exigent circumstances, police wrote "[h]omicide suspect from 5–10–11 at 2325 hours. Homicide suspect has a Sprint phone number...."[4]

---

**3.** At trial, the State presented "SafeZone" video footage and testimony from a Minneapolis crime lab technician showing a white Cadillac with characteristics matching Griffin's car, including damage to the car and a full view of Griffin's license plate. The footage showed the car traveling toward the Elks Club and in the vicinity of the murder scene from 10:47 to 11:30 p.m. on May 10, 2011.

**4.** Minneapolis police did not get a court order before requesting the cell phone records from Sprint/Nextel. But police obtained a court

order later that same day. As grounds supporting the requested order, police cited the following: Kim saw Griffin as she and Miller left the bar the night of the shooting; Griffin was driving his white Cadillac; witnesses heard shots fired and saw a white Cadillac driving away from the murder scene; and Kim had given police Griffin's name, date of birth, and a cell phone number that was associated with Griffin. The Hennepin County District Court approved and signed the order. It is not clear from the record what

The records police received from Sprint/Nextel revealed that the subscriber for the phone associated with Griffin was Griffin's girlfriend, not Griffin. In fact, Griffin's name was not listed on any of the cell phone records. Additionally, the records showed that the phone "was turned on, it was being used, and that it was hitting off cell site towers that [we]re in the proximity of where the murder happened" at the time the shots were fired. Specifically, a call was made from the phone approximately 25 minutes prior to the shooting that pinged off of a tower across the street from the Elks Club and showed that the phone was 1.88 miles away from the tower.

The Sprint/Nextel records also established that, as of the morning of May 11, the phone was located at Griffin's girlfriend's residence in Columbia Heights. Police arrested Griffin at a gas station in Columbia Heights after observing him leave his girlfriend's residence.

After arresting Griffin, police searched his girlfriend's residence and found a blue .38 caliber revolver fully loaded with five rounds, a 9 millimeter handgun, one copper-jacketed live round lying on the nightstand, a 20–count box of .38 caliber copper-jacketed rounds with five rounds remaining in it, and a title for a white Cadillac showing that the car belonged to Griffin. Additionally, police seized Griffin's white Cadillac and searched the vehicle. They found a box of .38 caliber copper-jacketed ammunition in the center console with five rounds missing. One of the cartridges in the .38 revolver had a fingerprint on it that matched Griffin's fingerprint and records

indicated that Griffin had purchased the .38 revolver.

Forensic testing was inconclusive as to whether the .38 revolver found in Griffin's girlfriend's residence was the gun used in the shooting of Miller. The forensic examiner stated that she "could neither say it was the gun and couldn't say it wasn't the gun." When Griffin was booked into jail, however, police found a .38 caliber silver tipped hollow point round with a disc down the center in the pocket of Griffin's shorts. The bullet recovered from Griffin's pocket had "similar class characteristics" to the bullet the medical examiner recovered from Miller's body. Griffin admitted owning the two guns found in his girlfriend's residence.

When police questioned Griffin, he initially denied being near the Elks Club on the night of the murder. He later admitted to being in North Minneapolis that night to pick up liquor. At trial, testimony was presented that at approximately 8:00 p.m. on the night of the murder, Griffin drove his white four-door Cadillac to the North Minneapolis home of his friend, K.J. K.J. noticed that Griffin seemed out of sorts and "[h]e really wasn't his self." Griffin commented to K.J. that "if a ni\*\*er come up with any bullshit, he's going to pop a ni\*\*er," which startled K.J.[5]

After leaving K.J.'s house, Griffin told police that he returned to his girlfriend's home, where he was living. Griffin told his girlfriend that he was going to a friend's house to pick up liquor. When Griffin left his girlfriend's home, he was driving his white Cadillac. Griffin went to the North Minneapolis apartment of T.L. and picked up a bottle of liquor around

Sprint/Nextel cell phone records arrived at the police department before the court order was signed. The state, however, makes no argument that police received the records at issue pursuant to the court's order.

5. The victim, Miller, was African–American.

11:00 p.m. Griffin stayed at T.L.'s apartment for a few minutes, leaving after a "short conversation." According to his girlfriend, Griffin returned to her house between 11:15 and 11:30 p.m. with the bottle of liquor. Griffin told police he initially lied about his location because, as a pastor, he did not want people to know he was "cheating on [his] wife" or "drinking." Griffin did not admit to being parked outside the Elks Club when his wife, Miller, L.M., and L.B. exited the club on May 10, 2011.

On July 11, 2011, a grand jury indicted Griffin for murder in the first degree in violation of Minn.Stat. §§ 609.185(a)(1), 609.11, 609.106, subd. 2(1) (premeditated murder), and murder in the first degree in violation of Minn.Stat. §§ 609.185(a)(3), 609.11 (murder by drive-by shooting). Griffin filed a motion to dismiss the indictment, arguing that there was insufficient evidence to support the charges and that consideration of inadmissible evidence had substantially prejudiced him and biased the grand jury. Among the evidence Griffin alleged was inadmissible was Kim's statement "[l]ook my husband is over there stalking me again." Griffin argued that Kim's statement was not admissible because his wife could not be called as a witness against him at trial under Minn. Stat. § 595.02, subd. 1(a) (2012).[6] Griffin also argued that Kim's out-of-court statement was inadmissible hearsay. The district court denied Griffin's motion, concluding that Kim's statement was admissible because it met the requirements of Minn. R. Evid. 807.

Prior to trial, Griffin moved for reconsideration of the district court's decision on the admissibility of Kim's statement and also moved to suppress the cell phone records obtained by police without a warrant. The court again denied Griffin's motion to exclude Kim's statement, rejecting his arguments that the statement had "no circumstantial guarantee of trustworthiness" and that the "prejudicial effect far outweighs [its] probative value." The court held that Kim "did not disavow that the Cadillac she saw was that of her husband, Derrick Griffin." Further, the court held that testimony about other vehicles observed near the Elks Club did not affect the trustworthiness of Kim's statement for purposes of assessing its admissibility under Minn. R. Evid. 807.

With respect to the cell phone records, the district court held that Griffin had "not adequately explained why he had a reasonable expectation of privacy in regard to the cell phone tower records" because there was "no evidence he tried to protect those records prior to the night in question" and Minnesota courts "routinely admit cell phone records." Consequently, the court found that "the police officers' actions of gathering [the] cell phone information did not infringe upon [Griffin's] constitutional rights."

Following the presentation of evidence, the jury returned guilty verdicts on both charges. For the crime of first-degree premeditated murder, the district court imposed a sentence of life imprisonment without the possibility of parole. This direct appeal followed.

## I.

■ We turn first to Griffin's argument that the district court erred in admit-

---

6. *Minnesota's spousal privilege statute provides that "[a] husband cannot be examined for or against his wife without her consent, nor a wife for or against her husband without his consent, nor can either, during the mar-* *riage or afterwards, without the consent of the other, be examined as to any communication made by one to the other during the marriage."* Minn.Stat. § 595.02, subd. 1(a) (2012).

ting Kim's out of court statement, "[l]ook my husband is over there stalking me again," under Minn. R. Evid. 807. Our precedent is clear that "[e]videntiary rulings rest within the sound discretion of the trial court and will not be reversed absent a clear abuse of discretion." *State v. Amos*, 658 N.W.2d 201, 203 (Minn.2003) (citing *State v. Glaze*, 452 N.W.2d 655, 660 (Minn.1990)). On appeal, Griffin has the burden of establishing that the court abused its discretion and that he was prejudiced by the evidentiary ruling. *Id.*

■ Rule 807 of the Minnesota Rules of Evidence provides that a hearsay statement "not specifically covered by rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness," may be admitted into evidence if it meets the criteria identified in the rule. When determining whether the statement has " 'equivalent circumstantial guarantees of trustworthiness,' " a district court uses a "totality of the circumstances test." *State v. Davis*, 820 N.W.2d 525, 537 (Minn.2012) (quoting Minn. R. Evid. 807); *State v. Robinson*, 718 N.W.2d 400, 408 (Minn.2006). In particular, the court should generally consider the following factors in evaluating trustworthiness:

> whether the statement was given voluntarily, under oath, and subject to cross-examination and penalty of perjury; the declarant's relationship to the parties; the declarant's motivation to make the statement; the declarant's personal knowledge; whether the declarant ever recanted the statement; the existence of corroborating evidence; and the character of the declarant for truthfulness and honesty.

*Davis*, 820 N.W.2d at 537 (citing *State v. Keeton*, 589 N.W.2d 85, 90 (Minn.1998) (explaining factors under a prior version of the residual exception rule codified at Minn. R. Evid. 804(b)(5))).

In addition to determining that the statement has the necessary "guarantees of trustworthiness," the rule also requires that the district court consider whether

> (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

*Id.* (quoting Minn. R. Evid. 807).

In this case, the district court concluded that Kim's statement, "[l]ook my husband is over there stalking me again," which was made as Kim exited the Elks Club with Miller, had circumstantial guarantees of trustworthiness that were equivalent to the trustworthiness guarantees that underlie the other hearsay exceptions in the Minnesota Rules of Evidence. The court reached this conclusion because the statement was made spontaneously among a group of Kim's friends and acquaintances, she affirmed the statement when L.M. asked "[i]n that Cadillac over there?" and, despite Griffin's assertion to the contrary, Kim did not disavow the statement when she was later interviewed by police. The court further explained that minor differences in the testimony of other witnesses did not affect the admissibility of Kim's statement for purposes of Minn. R. Evid. 807.

Having concluded that the statement made by Griffin's wife had equivalent circumstantial guarantees of trustworthiness, the district court considered the additional requirements of Minn. R. Evid. 807. First, under requirement (A) of Rule 807, the court found that the statement was "offered as evidence of a material fact." Specifically, witnesses saw the shooter flee

the murder scene in a white Cadillac and the alleged motive for the shooting was the romantic relationship between Miller and Griffin's wife. Consequently, evidence that shortly before the shooting, Kim saw Griffin's white Cadillac as she and Miller exited the Elks Club, which was located a few blocks from the murder scene, was probative of a material fact: the identity of the shooter.

Second, under requirement (B) of Rule 807, the district court considered whether Kim's statement was more probative on the point for which it was offered than any other evidence that the State could procure through reasonable efforts. Because there was "no other evidence purporting to place [Griffin's] vehicle" outside the Elks Club when Miller and Kim emerged, the court found that the second requirement in the rule was satisfied. The court also found that the statement was the most probative evidence of motive because seeing his wife with Miller arguably confirmed Griffin's suspicion that Kim and Miller were having an affair.

Third, under requirement (C) in Rule 807, the district court found that the statement had sufficient guarantees of trustworthiness such that admitting the statement into evidence would serve "the general purposes of [the Rules of Evidence] and the interests of justice."

Griffin argues that the district court abused its discretion when it admitted Kim's out-of-court statement because the statement lacked the equivalent circumstantial guarantees of trustworthiness required by Minn. R. Evid. 807.[7] In particular, Griffin contends that Kim's statement is not reliable because she later repudiated the statement; it was contradicted by other witnesses; it was testified to by L.M., who was biased; and there is doubt about whether Kim had a proper opportunity to accurately observe the subject of the statement.[8] The State counters that the district court did not abuse its discretion in admitting the statement because the court employed the correct totality-of-the-circumstances test and concluded that the statement was trustworthy, offered as evidence of a material fact, and was more probative than any other evidence, and therefore its admission served the general purposes of the rules of evidence and the interests of justice. Further, the State argues that Griffin's wife indicated uncertainty but never recanted her initial identifying statement, the statement was not contradicted by the testimony of other witnesses, the statement was not related to her culpability, and there was ample opportunity for her to make the observation.

We agree with the State that the district court did not abuse its discretion. We have affirmed the admission of a statement under Rule 807 when the statement was volunteered "without suggesting or leading questions," it "remained consistent throughout both of [the witness's] versions of what happened," the witness "had no motive to lie," and the witness "repeated

---

**7.** Griffin also argues that Kim's statement contained opinion testimony accusing Griffin of the crime of stalking without meeting the procedural requirements of *State v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965). Because Griffin did not raise this claim at the district court, it is waived. *Roby v. State*, 547 N.W.2d 354, 357 (Minn.1996).

**8.** At oral argument, Griffin also contended that Kim's statement was one of an existing state of mind and so covered by, but inadmissible under, Minn. R. Evid. 803(3), the rule that addresses admissibility of statements of "the declarant's then existing state of mind." Because Kim's statement was covered by Rule 803(3), but not admissible under that rule, Griffin argues that the statement is not admissible under Minn. R. Evid. 807. Because Griffin did not raise this argument below, it is waived. *Roby*, 547 N.W.2d at 357.

consistent versions of her statement to two different [people] within a short period of time." *Robinson,* 718 N.W.2d at 410.

Like the statement in *Robinson,* Griffin's wife's statement was voluntarily made without suggestion by others or leading questions; it was contemporaneous with the event she was describing; Kim confirmed her statement in response to L.M.'s question; and Kim had no motive to lie to Miller, L.M. and L.B. Kim also did not know her statement would later be evidence in a murder investigation, and her statement was based on her personal knowledge of her husband's car. Additionally, despite Griffin's assertion to the contrary, Griffin's wife never recanted her original identification, made any remarks inconsistent with the statement, or expressed reluctance to cooperate with police.

It is true that Kim's statement was not made under oath and it was not subject to cross examination. In addition, when questioned by police, Kim stated that she was not "sure" that the car she pointed out to her friends on the night of the murder was Griffin's car. But the district court has "broad discretion" in resolving evidentiary matters. *State v. Scruggs,* 822 N.W.2d 631, 643 (Minn.2012). Given that the court applied the correct legal test and based on its overall analysis of the relevant factors under Rule 807, we hold that the court did not abuse its discretion in admitting the statement.

## II.

■ We next turn to Griffin's argument that his Fourth Amendment rights and his rights under Article I, Section 10 of the Minnesota Constitution were violated when the district court admitted into evidence records of calls made and received

as well as the location of cell towers contacted by the cell phone Griffin was using at the time of the murder. Griffin argues that he has an expectation of privacy in these cell phone records and therefore his constitutional rights were violated when police obtained the records without a warrant and when those records were admitted at trial.[9] He contends that there were no exigent circumstances justifying the search. Further, he contends that given the general lack of understanding of how cell phones communicate with the cell tower and phone company, he had both a subjectively and an objectively reasonable expectation of privacy in the records at issue. Finally, Griffin argues that even though his girlfriend was listed as the subscriber on the cell phone records, he has a privacy interest in the records because he was a bailee of the phone.

The State argues that the district court was correct in finding that Griffin had no expectation of privacy in the cell phone records because under our decision in *State v. Gail,* 713 N.W.2d 851, 860 (Minn. 2006), Griffin was not the subscriber and therefore a stranger to Sprint/Nextel, the holder of the records. Further, the State contends that Griffin produced no evidence that he attempted to conceal anything about the cell phone and offered no other evidence supporting the conclusion that he had an expectation of privacy in the records. Finally, the State argues that there were exigent circumstances supporting the police attempt to obtain the records prior to the court order. We agree with the State that Griffin did not meet his burden of proving that he had an expectation of privacy in the records at issue.

■ A defendant's "rights to challenge any search under Article I, Section

9. Griffin challenges only the admission of his call log and cell tower records. He makes no allegation that police accessed the content of his cell phone calls.

10 of the Minnesota Constitution are coextensive with [the defendant's] rights under the Fourth Amendment to the United States Constitution." *State v. Carter,* 596 N.W.2d 654, 656 (Minn.1999). When a defendant alleges that a search violated his constitutional rights, we determine whether the search "has infringed an interest of the defendant which the Fourth Amendment was designed to protect." *State v. McBride,* 666 N.W.2d 351, 360 (Minn.2003) (citation omitted) (internal quotation marks omitted). The defendant "has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois,* 439 U.S. 128, 130 n. 1, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

■ In determining whether a defendant's rights have been violated under the Fourth Amendment, we apply a two-part test, first considering whether the defendant " 'exhibited an actual subjective expectation of privacy in the' cell phone records" and then "determin[ing] whether that expectation is reasonable." *Gail,* 713 N.W.2d at 860 (quoting *In re Welfare of B.R.K.,* 658 N.W.2d 565, 571 (Minn.2003)). In the first part, we "focus [our] inquiry on the individual's conduct and whether the individual sought to preserve something as private." *In re Welfare of B.R.K.,* 658 N.W.2d at 571 (citation omitted) (internal quotation marks omitted). We have "found that a defendant illustrates a subjective expectation of privacy when he attempts to conceal activity or items." *Gail,* 713 N.W.2d at 860. In the second part of

the analysis, an individual's "expectation of privacy is legitimate if it is one that society is prepared to recognize as reasonable." *State v. Perkins,* 588 N.W.2d 491, 492–93 (Minn.1999) (internal quotation marks omitted).

In *Gail,* we considered whether, under the Minnesota Constitution, the defendant had a subjective expectation of privacy in his cell phone records. 713 N.W.2d at 859–60. The defendant in *Gail* had not "attempted to conceal anything about the cell phone he used" and "was a stranger to [the phone company], the holder of the records at issue." *Id.* at 860. We held that "[b]ecause two other people stood between [the defendant] and [the phone company], and [the defendant] did not testify or call any witnesses to support a finding that he had an expectation of privacy in the records," we could not "conclude on th[at] record that [the defendant] subjectively expected [the phone company] to keep records of his cell phone usage private." *Id.* Additionally, we noted that we could not "conclude that [the defendant] did anything himself to keep his cell phone usage confidential" because he repeatedly called the victim and police were able to discover the defendant's phone number on the victim's cell phone. *Id.* We therefore held that "the district court did not err in refusing to suppress the cell phone records." [10] *Id.* at 860–61.

We reach the same conclusion in this case. Like the defendant in *Gail,* Griffin

**10.** In *United States v. Jones,* the United States Supreme Court ruled that the attachment of a GPS tracking device to a Jeep in the defendant's possession and subsequent monitoring for 28 days violated the defendant's Fourth Amendment rights because the government engaged in a trespass to reach into one of the "protected areas enumerated in the Fourth Amendment" and "attach[] the device to the Jeep." —— U.S. ——, 132 S.Ct. 945, 952–53, 181 L.Ed.2d 911 (2012). Unlike the defendant in *Jones,* Griffin has not presented any evidence that police engaged in a trespass to obtain his cell phone records. Moreover, the Court in *Jones* left open the question of the Fourth Amendment significance of Jones' lack of ownership of the Jeep. *Id.* at 949 n. 2, 132 S.Ct. 945. Consequently, nothing in *Jones* calls into question the continued vitality of our analysis in *Gail,* 713 N.W.2d at 858.

was not the subscriber associated with the phone. Rather, Griffin's girlfriend was the subscriber of record and Griffin's name did not appear on Sprint/Nextel's records. Also, on the day of the murder Griffin initiated 46 outgoing calls or text messages, including some to his wife, who voluntarily gave his phone number to police. Finally, like the defendant in *Gail*, Griffin offered no evidence that would support the conclusion that he had an expectation of privacy in the cell phone records. Under *Gail*, because Griffin was a stranger to Sprint/Nextel and presented no evidence that he expected Sprint/Nextel to keep his phone usage private, he did not meet his burden to show that he had a subjective expectation of privacy in the cell phone records.

Based on *Gail*, we conclude that the Griffin did not have a subjective expectation of privacy in the cell phone records and therefore we hold that the admission of the cell phone records did not violate Griffin's Fourth Amendment rights or his rights under Article I, Section 10 of the Minnesota Constitution.

Affirmed.

LILLEHAUG, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.