*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0587**

State of Minnesota,
Respondent,

vs.

Levi Chen-Wah Leong,
Appellant.

**Filed May 11, 2015
Affirmed
Hooten, Judge**

Chisago County District Court
File No. 13-CR-12-955

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Janet Reiter, Chisago County Attorney, Nicholas A. Hydukovich, Assistant County Attorney, Center City, Minnesota (for respondent)

Glenn P. Bruder, Mitchell, Bruder & Johnson, Edina, Minnesota (for appellant)

Considered and decided by Stauber, Presiding Judge; Schellhas, Judge; and Hooten, Judge.

**U N P U B L I S H E D   O P I N I O N**

**HOOTEN**, Judge

On appeal from his conviction of third-degree criminal sexual conduct for having a sexual relationship with a patient, appellant psychiatrist argues that the district court erred by: (1) allowing the state to introduce other-acts evidence through a former patient;

(2) allowing the state to present testimony from a medical expert regarding standards and practices in the psychiatric field; and (3) excluding evidence that appellant had tested negative for a sexually transmitted disease. Appellant also alleges that the evidence was insufficient to convict him. We affirm.

**FACTS**

This appeal involves a disputed sexual relationship between a psychiatrist, appellant Levi Chen-Wah Leong, and his patient, R.R. In 2011, R.R. was a 23-year-old woman suffering from depression, anxiety, and alcoholism. Leong treated his patients with psychotherapy and prescription medication. R.R.'s first psychotherapy session with Leong was on September 14, 2011, a "pretty standard" intake interview with no physical contact. But in later appointments, Leong would sit next to R.R. on a couch in his office and make physical contact with R.R. by patting her leg or putting his arm around her shoulder. R.R. did not stop seeing Leong, but noted her concern about his behavior to her parents and friends.

In November 2011, R.R. entered a residential treatment program for her alcohol abuse. She continued to have appointments with Leong while she resided at the treatment center. At a Friday appointment, Leong asked R.R. where the patients at the treatment program went to church, and he then showed up at that church on the following Sunday. R.R. was "flustered" by Leong's unexpected appearance. The next day, she had another appointment with Leong, during which the two discussed sensitive issues from R.R.'s past and Leong placed his hand on her face during the therapy session. After the appointment and before returning to the treatment center, R.R. absconded with a friend's

2

vehicle and consumed alcohol. She eventually returned to the treatment center in an intoxicated state. When confronted by program staff about her intoxication, she told them that Leong's questions about her past and his inappropriate physical contact incited her to use alcohol. Program staff discharged her for violating program policy.

After her discharge, R.R. sent Leong an e-mail indicating her reluctance to continue therapy with him and sought a referral to see a female therapist. Leong sent a response noting his disappointment with her decision and told her that his therapy sessions are "the safest environment to untangle confusion" because he "would risk all of [his] personal and professional life" if they "behaved immorally." On that same day, Leong called the treatment program and left a voicemail indicating that he wanted to do a welfare check on R.R. When the program's director contacted Leong the next day and informed him that R.R. had made allegations that he had touched R.R. inappropriately, Leong remained silent. He then continued to ask questions as to R.R.'s whereabouts.

A few days later, R.R. sent Leong an e-mail saying that she had "no recollection" of any accusations she made about Leong at the treatment center, and Leong replied that he would not hold it against her. R.R. continued her therapy with Leong, and he began spending time with her outside of appointments. The two went to church together and visited each other's homes for family dinners. However, R.R. soon stopped going to church with Leong, as she felt the situation was "getting weird."

Leong visited R.R. at her townhouse on the night of November 23, 2011. R.R. testified that she drank wine and took "too many" lorazepam pills that night, and that Leong made no effort to stop her from doing so. She said that she remembered nothing

3

else about that night.  Leong had prescribed lorazepam to R.R. that same day and acknowledged at trial that the combination of lorazepam and alcohol can cause amnesia. Early the next morning, R.R.'s father came to the townhouse to make sure R.R. and her children would be at their family's Thanksgiving gathering.  R.R.'s father went upstairs to R.R.'s bedroom and saw Leong lying in bed next to his daughter in "nighttime clothes."  R.R.'s father asked Leong what was going on, and Leong responded that R.R. had drank too much the night before and was still sleeping.  R.R.'s father was overwhelmed by the situation and left the townhouse.  Later that day, R.R. sent Leong an e-mail stating, "I really hope we did not have sex.  I will leave you be [and] stop calling [and] talking with you.  I just want to know exactly what happened last night."

R.R. testified that a week later, on November 30, Leong had sexual intercourse with her.  R.R. testified that the two were out earlier that night and then had sex at her townhouse.  She said that Leong did not use protection and did not stay the night.  R.R. was still being treated by Leong as a patient at that time.  The next morning, R.R. sent an e-mail to Leong:

> Good morning.  I hope all is well and [you're] not too tired.  I am worried about how you are feeling or what you are thinking[.]  I hope we can talk [sometime] today.  I care about you tremendously and I truly want everything to work out between us.  *I am worried you were disappointed with our intimacy*.  I am sorry Levi, please tell me how you are feeling sooner than later. . . .  Lots of love.

(Emphasis added.)  R.R. testified that the mention of "our intimacy" in the e-mail referred to Leong having sexual intercourse with her.

R.R. had her last therapy appointment with Leong on December 5, 2011. Later that day, Leong was present at R.R.'s townhouse while she was drinking, and R.R. asked Leong to take her to the liquor store. Leong drove past the liquor store and instead took R.R. to her mother's house. R.R. was subsequently taken to the emergency room because of her alcohol consumption. The next day, R.R. sent Leong an e-mail apologizing for her conduct, and Leong responded that "this changes nothing between us."

At the end of December 2011, R.R. told Leong to stop contacting her because "this [wasn't] meant to be" and again asked him for a referral to see a new therapist. Leong continued sending e-mails to her despite her request, and in early January 2012, he went to R.R.'s townhouse after she failed to answer his phone calls. R.R. locked the door, shut her curtains, and waited as Leong knocked for two hours and continued calling her. Leong did not leave until R.R.'s father called him and threatened police involvement if he did not stop contacting her. Leong then sent R.R. an e-mail, telling her that he had gone to the townhouse to see if R.R. still wanted to be his friend and informing her that his wife would soon return from a trip overseas. The last line of his e-mail noted that he could be divorced before spring if his wife "revert[ed] to [her] past controlling behaviors."

R.R. had minimal contact with Leong after this incident, with the exception of two e-mails to Leong regarding issues with her prescriptions. R.R. eventually told her father, her mother, and one of her friends that Leong had had sexual intercourse with her, but law enforcement did not investigate this allegation until R.R. entered another chemical

dependency treatment program in August 2012. R.R. informed program staff of her history with Leong, and the staff forwarded the information to law enforcement.

In connection with that investigation, Leong was charged with one count of third-degree criminal sexual conduct under Minn. Stat. § 609.344, subd. 1(h)(ii) (2010), which prohibits a psychotherapist from "engag[ing] in sexual penetration" with a patient "outside the psychotherapy session if an ongoing psychotherapy-patient relationship exists." A four-day jury trial was held in October 2013. R.R. and her parents and friends testified as witnesses for the state. A number of professionals testified as well, including employees of the inpatient chemical dependency program used by R.R. and the police officer and social worker who investigated the case after R.R. reported the alleged sexual encounter. In addition to the witnesses who provided the above-stated facts, the state called two other witnesses over the objections of Leong: a woman named K.U., who testified about her own psychotherapy sessions while being treated by Leong, and a psychiatrist who testified about ethics and treatment practices in psychiatry.

For the defense, Leong's mother testified that Leong had largely spent the evening at home with his parents on November 30, 2011, only leaving once for 45 minutes to "go help a friend" and later returning. Leong also testified. He acknowledged the inappropriateness of his relationship with R.R., saying that he "went too far" and "cared . . . too much about her." He admitted to socializing and going to church with her, explaining that he wanted to "give her some healthier role models." And while he largely corroborated the events of his and R.R.'s relationship, he claimed that two incidents did

6

not occur: his alleged overnight stay at R.R.'s townhouse on November 23–24 and the alleged sexual intercourse between him and R.R. on November 30.

The jury found Leong guilty of third-degree criminal sexual conduct. After denying Leong's motion for a new trial or for a judgment of acquittal, the district court sentenced him to 48 months in prison. This appeal followed.

## D E C I S I O N

### I.

On appeal, Leong challenges three of the district court's evidentiary rulings. "[E]videntiary rulings rest within the sound discretion of the trial court and will not be reversed absent a clear abuse of discretion." *State v. Griffin*, 834 N.W.2d 688, 693 (Minn. 2013) (quotation omitted). Leong bears the burden of establishing that the district court abused its discretion and that he was prejudiced by any erroneous ruling. *Id.*

#### A. Expert Testimony

Leong first challenges the district court's decision to allow the state to introduce expert testimony from a psychiatrist, Dr. Lori Polubinsky, as to ethical standards in the psychiatric field. Over Leong's objection, the district court allowed Dr. Polubinsky to testify as to proper boundaries in psychiatrist-patient relationships, as the district court believed that the jurors would lack knowledge of what those boundaries should be in light of the glamorization of doctor-patient relationships in television and film.

Dr. Polubinsky testified that the medical ethics rules are premised on the imbalance of power between doctor and patient and are intended to protect the patient. She provided the specific ethical rule proscribing sex between psychiatrists and patients

7

and detailed other doctor-patient boundary violations, including physical contact beyond a handshake, attending social events with a patient, and entering into a romantic relationship with a patient. Dr. Polubinsky also testified as to general psychiatric practices, explaining that psychiatrists typically perform welfare checks on patients only if they are suicidal, and that psychiatrists conduct them by contacting law enforcement who can determine whether hospitalization is needed. She opined that lorazepam should not be prescribed to alcoholics because it has similar addictive qualities as alcohol, and noted that lorazepam in combination with alcohol can cause blackouts. She also stated that most psychiatrists do not practice psychotherapy because it is subject to low reimbursement rates from insurance companies.

Expert testimony is allowed only if it "assist[s] the trier of fact to understand the evidence or to determine a fact in issue." Minn. R. Evid. 702. However, expert testimony should not be admitted if the jury can resolve a fact issue by applying principles of general or common knowledge and the expert testimony could dissuade the jury from exercising its own independent judgment. *State v. DeShay*, 669 N.W.2d 878, 885 (Minn. 2003).

Leong argues that this expert testimony was unhelpful and cumulative, as Leong essentially conceded at trial that his relationship with R.R. was inappropriate. He also claims that he was prejudiced by the fact that Dr. Polubinsky gave testimony not only about medical ethics, but also the unusualness of psychiatrists practicing psychotherapy and her views as to the impropriety of prescribing lorazepam to alcoholics. He argues

8

that this testimony unduly influenced the jury to believe that Leong's treatment was geared to "take advantage of [R.R.] to gratify his personal needs."

Leong's arguments are unpersuasive. This case essentially turned on the jury's determination of Leong's credibility. While Leong may have admitted to the impropriety of his relationship with R.R. in light of the fact that she was his patient, his testimony attempted to create a portrait of an overly caring psychiatrist who got carried away in pursuing a friendship with a patient. Dr. Polubinsky's testimony, including the information about doctor-patient boundaries, psychotherapy, and lorazepam treatment, therefore aided the jury in determining whether to believe Leong's professed benevolent intentions toward R.R. She did not offer an opinion on the specific facts of Leong's conduct with R.R., but rather provided the jury with information on the psychiatric profession that it would not have otherwise received from Leong or any other witness.

Moreover, Leong's contention that Dr. Polubinsky's testimony unexpectedly "morph[ed]" at trial beyond the issues the state represented she would be testifying about is not borne out by the record. In his motion in limine to exclude her testimony, Leong acknowledged that Dr. Polubinsky would "likely focus on her review of the exchanged emails, the frequency of appointments, *and the use of medications*." (Emphasis added.) The state's response provided that she "will testify generally to standards and normal practices in the psychiatric field *in areas such as* boundaries" and other doctor-patient relationship issues. (Emphasis added.) Leong was on notice that Dr. Polubinsky would be giving generalized testimony about the psychiatric profession, and he does not argue that this testimony was outside the limits of her uncontested expertise in psychiatry. *See*

9

*State v. Crow*, 730 N.W.2d 272, 280 (Minn. 2007) (providing that experts "may not testify to matters beyond [their] expertise"). We conclude that the district court did not abuse its discretion by allowing Dr. Polubinsky to testify.

## B. Rule 404(b) Testimony

Leong next argues that the district court abused its discretion by allowing the state to introduce the testimony of K.U. under Minn. R. Evid. 404(b). At trial, K.U. testified that she was a recovering alcoholic who had also abused lorazepam, and she began to see Leong in February 2012 for psychotherapy sessions designed to treat her depression and anxiety. During their first appointment, Leong asked questions about her past sexual abuse and her sex life at home, including whether her husband was a "domineering person with [her] sex life." When the session ended, Leong gave her a "deep, kind of personal hug" and rubbed her back. He also prescribed lorazepam for her despite her past substance abuse problems. She testified that, during a later psychotherapy session, Leong grabbed her face while she was reading an article with him and that she feared he was going to kiss her. She continued seeing Leong in spite of her concerns about his actions, but would purposely put a big purse and a big coat next to her chair so he would not sit next to her. Leong would move those items, sit next to her, and rub her leg. After raising these concerns with her primary physician, K.U. transferred to a different psychiatrist after seven appointments with Leong.

Evidence of a defendant's other "crime, wrong, or act," otherwise known as *Spreigl* evidence, cannot be admitted to prove the defendant's character "in order to show" that the defendant acted in conformity therewith. Minn. R. Evid. 404(b); *see State*

10

*v. Spreigl*, 272 Minn. 488, 490–91, 139 N.W.2d 167, 169 (1965).  But, such evidence may be admissible for "other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  Minn. R. Evid. 404(b).  When the evidence is of post-crime incidents, it should be "admitted with caution."  *State v. Wiskow*, 501 N.W.2d 657, 659 (Minn. App. 1993).  A five-step process is followed in determining whether to admit such other-acts evidence:

> (1) the state must give notice of its intent to admit the evidence; (2) the state must clearly indicate what the evidence will be offered to prove; (3) there must be clear and convincing evidence that the defendant participated in the prior act; (4) the evidence must be material and relevant to the state's case; and (5) the probative value of the evidence must not be outweighed by its potential prejudice to the defendant.

*State v. Ness*, 707 N.W.2d 676, 686 (Minn. 2006).

On appeal, Leong challenges the relevance and probative value of this other-acts evidence.  The district court, in admitting K.U.'s testimony regarding Leong's "grooming" behavior, relied solely on the common scheme or plan exception under rule 404(b), concluding that her testimony was relevant to determining whether R.R. was similarly groomed for a romantic relationship with Leong.  To be admissible under the common scheme or plan exception, the incident must have a close relationship in time and place to the charged crime, as well as "a marked similarity in modus operandi," but the other act "need not be identical in every way to the charged crime."  *Id.* at 688 (quotation omitted).

In attempting to refute the similarities between K.U.'s testimony and the facts of the charged offense, Leong produces a list of differences: Leong never invited K.U. to his

11

house, had dinner with her, sent her e-mails, or had sex with her. But, many similarities between the circumstances of Leong's conduct with K.U. and R.R. remain. R.R. and K.U. both had a history of alcohol abuse, coupled with depression and anxiety problems. Leong began treating K.U. in February 2012—two months after he allegedly had sexual intercourse with R.R. and a matter of weeks after R.R. had cut off contact with him. And, while Leong allegedly had sex with R.R. at her townhouse, Leong's grooming behavior with both R.R. and K.U. was established in his office. Further, once Leong began therapy with each of them, the course of events in his office was quite similar: as Leong gained familiarity with each patient, he escalated his physical contact enough to make both women uncomfortable. He also prescribed lorazepam to both of them, contravening Dr. Polubinsky's expert opinion at trial that alcoholics should not be treated with that drug. While not "identical," this was "markedly similar" conduct outside professional boundaries that supports the state's theory of the case that Leong was grooming vulnerable female patients in order to have sex with them; therefore, we conclude that K.U.'s testimony was relevant to showing a common scheme or plan under rule 404(b). *See id.* (quotation omitted).

Leong further argues that this evidence's unfair prejudice outweighs its probative value because the "innocuous" nature of his conduct with K.U. runs counter to evidence of other crimes or acts typically admitted under rule 404(b) and establishes that this evidence was really introduced to suggest Leong's propensity for sexual involvement with patients. In determining whether the evidence's probative value outweighs its potential for unfair prejudice, we balance the evidence's relevance and "the [s]tate's need

12

to strengthen weak or inadequate proof" against its risk of use as propensity evidence. *State v. Fardan*, 773 N.W.2d 303, 319 (Minn. 2009).

Leong's characterization of his conduct with K.U. as "innocuous" cuts against his argument that this evidence wrongly shows his character for committing bad acts. If Leong's conduct toward K.U. truly "could just as readily be perceived as caring rather than wrongful," then this evidence could have established his propensity for *caring*, not for committing crimes, and any unfair prejudice to Leong was minimized by the evidence's relatively benign nature. And, while Leong claims that rule 404(b) is intended to allow the admission of only overtly criminal evidence by citing several cases that admitted evidence of other *crimes*, the rule allows evidence of "crime[s], wrong[s], or *act[s]*." Minn. R. Evid. 404(b) (emphasis added). Caselaw indicates that district courts have properly admitted conduct that does not amount to a criminal act in order for the state to prove a common scheme or plan under the rule. *See, e.g.*, *Wiskow*, 501 N.W.2d at 659–60 (concluding that district court did not err by admitting pornographic magazine that defendant had shown victim three months after the offense).

Further, rule 404(b) evidence of this nature gains probative value when the defendant specifically alleges that the victim is fabricating the conduct on which the charge is based. *See State v. Wermerskirchen*, 497 N.W.2d 235, 237, 241–42 (Minn. 1993). Thus, K.U.'s testimony had significant probative value in light of the state's need to bolster R.R.'s credibility in order to counter Leong's claim that she fabricated her testimony that the two had sexual intercourse. Moreover, a district court's instructions to the jury as to the use of rule 404(b) testimony can "lessen[] the probability of undue

13

weight being given by the jury to the evidence," *State v. Bartylla*, 755 N.W.2d 8, 22 (Minn. 2008) (quotation omitted), and the district court gave such an instruction before K.U.'s testimony and at the close of trial. Based on these considerations, we conclude that the district court did not abuse its discretion by allowing K.U. to testify at trial.

## C. Exclusion of HPV Test Result

Leong next challenges the district court's decision to prevent him from introducing the result of a human papillomavirus (HPV) test taken by Leong. Before trial, the district court ruled that, without expert testimony establishing the contagiousness of HPV, Leong had failed to demonstrate the test's relevance. Leong testified at trial that R.R. told him that she had HPV, but he did not testify as to his negative test result. Reconsidering the issue after Leong testified, the district court again stressed that without medical testimony establishing the fact that unprotected sexual intercourse by a male with a female with HPV would result in transmission of the disease, the test results "would have been very misleading to the jury" in its determination of whether intercourse occurred. Leong argues that the district court erred in excluding this evidence because the fact that HPV is a sexually transmitted disease is "widely known in the community," and the test result was thus relevant and probative even without expert testimony.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Minn. R. Evid. 401. Assuming that Leong's

14

purported negative HPV test result was scientifically valid,[1] that evidence would have tended to make it more likely that he did not have sex with R.R. However, the rules of evidence give district courts the discretion to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice . . . or misleading the jury." Minn. R. Evid. 403.

Here, the district court correctly noted the danger of misleading the jury if Leong had been allowed to introduce the test result. While it is a matter of general knowledge that HPV is a contagious sexually transmitted disease, and Leong could have testified to such, without expert testimony the jury would be left to guess as to how often and in what situations HPV can be transmitted between sexual partners. Leong's counsel was aware of the district court's desire for an expert witness and told the district court that he had subpoenaed such an expert, but ultimately failed to produce such a witness. Under these circumstances, any minimal probative value of the supposed negative test result was

---

[1] The medical records that purportedly show that Leong tested negative for HPV are absent from the record on appeal. Under Minnesota law, proponents of novel scientific evidence derived from a specific test are required to satisfy the two prongs of the *Frye-Mack* standard before such evidence can be admitted. *See State v. MacLennan*, 702 N.W.2d 219, 233 (Minn. 2005). "A *Frye-Mack* analysis requires both general acceptance in the relevant scientific community and foundational reliability." *Id.* While we make no opinion as to the potential outcome of any *Frye-Mack* determination that could have been made in this case, we note that other jurisdictions have found that there is currently no reliable method to test for HPV in men. *See Kohl v. Kohl*, 149 So.3d 127, 139 (Fla. Dist. Ct. App. 2014) ("Currently, the CDC does not even recommend an HPV test for men."); *Endres v. Endres*, 968 A.2d 336, 343 (Vt. 2008) ("Several forms of HPV are subclinical and do not produce any symptoms for years, and in men HPV rarely produces symptoms or leads to other health problems."). Our unpublished caselaw provides that testimony to this effect has been given in other criminal cases. *See State v. Simon*, No. A06-2462, 2008 WL 1971397, at *4 (Minn. App. May 6, 2008) ("[The nurse] testified that HPV cannot be tested in males."), *review denied* (Minn. July 15, 2008).

greatly outweighed by the danger that the jury, without the assistance of expert testimony, would have misused the test result by speculatively inferring a lack of sexual intercourse. We conclude that the district court did not abuse its discretion by excluding this evidence as irrelevant and misleading.

## II.

Leong lastly contends that the record as a whole is insufficient to support his conviction for third-degree criminal sexual conduct. In considering a claim of insufficient evidence, we conduct "a painstaking analysis of the record to determine whether the evidence, when viewed in the light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." *State v. Ortega*, 813 N.W.2d 86, 100 (Minn. 2012) (quotation omitted). In undertaking this analysis, we assume that the jury believed the state's witnesses and disbelieved evidence to the contrary. *State v. Hayes*, 826 N.W.2d 799, 805 (Minn. 2013). "This is especially true where resolution of the case depends on conflicting testimony, because weighing the credibility of witnesses is the exclusive function of the jury." *State v. Pieschke*, 295 N.W.2d 580, 584 (Minn. 1980). "We do not disturb the verdict if the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the charged offense." *Ortega*, 813 N.W.2d at 100.

Leong was convicted of third-degree criminal sexual conduct under Minn. Stat. § 609.344, subd. 1(h)(ii). At trial and on appeal, Leong only disputes the sufficiency of the evidence establishing that he had sexual intercourse with R.R. The only direct

16

evidence produced at trial that Leong had sex with R.R. was R.R.'s testimony that the two had sex on the night of November 30, 2011. Leong claims that her statements about that night, both at trial and to investigators, were "neither consistent nor detailed" and argues that the evidence at trial actually "illustrated R.R.'s propensity to embellish her relationship with Leong." He also points to two incidents that he claims impugn her credibility: (1) the fact that prior to the alleged offense, other residents of the chemical dependency treatment program that R.R. was attending in November 2011 indicated that R.R. had told them that she was having sex with Leong; and (2) the inherent conflict between R.R.'s father's testimony that he saw Leong in bed with R.R. on Thanksgiving morning and phone records of calls between Leong and R.R. early that same morning.

This argument is unpersuasive in light of our standard of review and the nature of this case. Here, the jury had to make a choice in reaching its verdict: credit R.R.'s testimony that Leong had sex with her on November 30 and find Leong guilty, or credit Leong's testimony that he refused R.R.'s advances that night and acquit. Because we defer to the jury's credibility determinations and assume that evidence supporting the conviction was believed, *Pieschke*, 295 N.W.2d at 584, we assume that the jury necessarily discredited Leong's testimony and believed R.R. *See State v. Hamilton*, 289 N.W.2d 470, 477 (Minn. 1979) ("[T]he jury was entitled to believe complainant's story and disbelieve defendant's account."). And, while Minnesota law specifically provides that "the testimony of a victim need not be corroborated" in a prosecution under this statute, Minn. Stat. § 609.347, subd. 1 (2010), R.R.'s testimony is corroborated by the record. The e-mails, phone calls, and witness testimony all corroborated the fact that

17

Leong and R.R. were in a relationship far beyond that of an appropriate psychiatrist-patient relationship, thereby bolstering R.R.'s credibility. On this record, we conclude that there was sufficient evidence to support Leong's conviction of third-degree criminal sexual conduct.

**Affirmed.**